SHAW v. THE STATE OF GEORGIA.

1. Where misconduct of a juror or of the jury is shown, the presumption is that the defendant has been injured, and the *onus* is upon the State to remove such presumption by proper proof. While reviewing courts are loth to interfere with the decision of the trial judge that the presumption has been removed, such decision is in this State subject to review. The misconduct of the jury and of the officer in charge of them in this case was of such a character as to require a new trial.

2. Objections to evidence must be specified.

(a) A photograph of the locality of the homicide in which persons were placed in the positions said to have been occupied by the defendant and his accomplices, which was introduced in evidence by

the State, does not seem to have been of such a character as to
tend to inflame the jury, though its use seems to be unnecessary.
3. There is no error in the other grounds of the motion for a new
trial, under the explanation of the judge.

May 20, 1889.

Criminal law.   Jury and jurors.   Practice in supe-
rior court.   Evidence.   Before Judge BOYNTON.   Butts
superior court.   September term, 1888.

Thomas Shaw, together with O. L. Welch, Jasper
Willard and Jesse Yancy, was indicted for the murder
of Thomas McNair.   Upon the trial of Shaw, the evi-
dence for the State tended to show as follows:

Welch, Willard and one Wilson met, on the evening
before the killing, at Welch's store.   Yancy was not
there, and it does not appear that Shaw was.   Welch
said "he wanted us to go down to Tom McNair's."
Wilson and Willard both told him that they must go
back home, and the two last mentioned went down the
road. · Welch told them to leave Willard's mule and
buggy down in the woods, and they did so at a point
near a road.   After a while, Welch, Shaw and Yancy
came to them; they all ate supper and then went down
the road to near the house of deceased.   Welch had
brought a double-barrelled shot-gun.   Welch and Shaw
went down in front of the house.   Welch came back
and gave orders for all to pull off their shoes.   Yancy,
Welch and Willard pulled off their shoes and went to
the end of the house.   Wilson went to a walnut tree
standing near the house; Shaw was in front of the
house.   Shaw or some of the party called deceased out.
He came out and asked what was wanted, and was told
it was "Jinks," whose harness was broken.   Deceased
then went back into the house and got a lamp and
came out.   After he had got about fifteen or twenty
feet, a gun fired and he fell with a groan.   When Shaw
was first seen after the shooting, by Wilson who testi-

fied to the above, he was standing in the road about fifty yards from the house. There was a pistol fired four or five times. All the firing was done from the corner of the house. It was about eleven o'clock at night. Welch said if anything happened he would take all the responsibility on himself. Whether he said this to anybody but Wilson does not appear. There was also evidence for the State that Shaw made a confession, in which he said that Welch got him under the influence of whiskey, and he went with him; that he, Welch, Wilson, Yancy and Willard went down to Mc-Nair's house; that he or Wilson called McNair out; and that he did not know they were going to kill Mc-Nair, but thought that they were going to whip him. The State introduced a photograph of the house and its surroundings, where the killing was done, over defendant's objection. One E. M. Hooten testified that this photograph was a correct representation of the place and its surroundings.

The defendant introduced no evidence. He made a statement in which he claimed that Welch had induced him to come over to Welch's house on a plea of business; that while there Welch had given him whiskey; and after a while Welch and Yancy went out of the house, and he saw Yancy go off through a field with a gun on his shoulder, and Welch came back in the house; that defendant staid there and kept on drinking until about night, when he got ready to start home; that Welch told him he was going down that way, and they went on together some distance, when Willard joined them, and after a while they met Yancy; that defendant stopped, and they went on down the road; that when he got up with them, Wilson was with them and they were eating; that defendant did not eat but drank whiskey with them; that they went on together, Welch saying he was going down about Finch's store;

that when they got to Finch's store, Welch said for them to wait a while, and come on down and stop at the gin-house, and Welch and Yancy went on ; that defendant asked what they were going to do, and Wilson said they were going to look after Tom McNair; that they went on to the gin-house where Welch and Yancy came to them; that they went on down the road, and he got sleepy ; that he recollected that Welch came to him and woke him up, but did not know where they were and did not know where McNair lived; that the next he remembered he heard guns firing and heard the woman screaming, and when he heard the screaming, the others came up behind him but did not say anything about the shooting; and after a time, Willard asked Yancy how he felt about it, and Yancy said. he had only shot a dog.

After verdict of guilty, the defendant moved for a new trial on the following grounds (besides those set out in the opinion):

(1) Error in allowing the sayings of Welch and others, defendants, to be given in evidence against the defendant, before any proof showing a conspiracy and common purpose on the part of them and defendant to commit the crime charged in the indictment. (The judge certified that some evidence as to mutual understanding of defendants to go to the house of deceased that night had been introduced before the testimony complained of was allowed.) .

(2) Error in allowing a photograph of the house and grounds where the alleged villainy took place, with a picture of persons not connected with the photograph, to be introduced in evidence, as the same was calculated to prejudice the jury.

(3) Verdict contrary to law and evidence.

The motion was overruled, and defendant excepted.

A. D. HAMMOND, T. W. THURMAN and L. L. RAY, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general, and EMMETT WOMACK, solicitor-general, for the State.

SIMMONS, Justice.

Thomas Shaw was tried and convicted upon the charge of murder. He made a motion for a new trial, upon the several grounds therein, which motion was overruled, and he excepted. The main grounds relied upon before us for the reversal of the court below in refusing a new trial, were the 6th and 7th grounds of the original motion, and the 1st ground of the amended motion, which are as follows:

"6th. Because the jury, while the case was pending, went to church at night.

"7th. Because said jury, while at church at night, heard the prosecutor in said case talk and shout; also heard a prayer in reference to the execution of the law and the maintenance of justice.

"1st. That said jury attended the Baptist church in a body, and while there was addressed by the prosecutor in said case, and was exposed to the crowd going to and from the church."

These grounds were certified to by the trial judge, "with reference to the affidavits to sustain and rebut the same," which appear in the record. These affidavits show, in substance, that pending the trial, and after the argument to the jury had begun, night came on and the court took a recess until the following morning, and instructed the bailiff who had charge of the jury, and the jury themselves, not to allow any one to speak to them, or to speak in their presence, about the cause, nor to discuss it among themselves until the argument of the case was concluded; that during that night, the bailiff took the jury from the jury-room

(where he was ordered to keep them) to a church where a prayer-meeting was being held, conducted by the pastor who was the active prosecutor in the case ; that upon their arrival at the church, the prosecutor, Mr. Hooten, politely assigned the jury to seats in the church, separate and apart from the congregation, and that he addressed the jury.    The affidavits further show that upon the termination of the exercises, the jury left the church and mixed with the crowd, some of the congregation going out before, and some after the jury.

The State introduced a number of affidavits to show that, while the jury attended the meeting at the church, they were given seats wholly apart from the congregation, and that no reference was at any time made to " any law case whatever"; that they left the church in a body in charge of the bailiff, without mixing with the crowd, and without any person having any opportunity to have a conversation with them, either while they were at the church or when they were leaving it ; and that the prayer to which reference is made in the 7th ground of the motion made no further reference to the court and jury in said case, than to ask " that the blessings of God might rest upon our government with its officers, and that God would bless the officers of the court then in session, that they might be guided aright in the discharge of their duties."    The bailiff who was in charge of the jury made an affidavit that, during the trial, no one spoke of the case in the presence of the jury, and that nothing was said about the prisoner in their presence; that he was careful to guard them, and and not thinking it was improper, had gone with them to the prayer-meeting ; that on their way to and from the church they did not separate, nor was anything said to them or any of them, or in their presence, about the case ; that at the church they were seated apart

v 83-7

from the congregation; and that the usual services were held, and nothing was said about the case. The jurors also made affidavits, in which they say that they attended the prayer-meeting in a body, and did not disperse or separate; that they were provided with seats together, apart from the rest of the congregation; that the services were such as are usual at prayer-meetings, and that nothing was said by any one in their hearing, during, after or before the services, directly or indirectly, about the case on trial, or about any one connected with the case; that they were not approached by any one at any time with a view of influencing their verdict; and that their verdict was not in any way influenced by the act, presence or words of any persons at that time or at any other time, outside of the testimony in the case, but that their verdict was made up calmly and dispassionately from the testimony as they understood it. The trial judge, after hearing these affidavits, overruled the motion for a new trial. The effect of this judgment was, that in his opinion, the State had shown beyond a reasonable doubt that the defendant was not injured by the misconduct of the bailiff and jury.

1. The law in this State is, that where misconduct of a juror or of the jury is shown, the presumption is that the defendant has been injured, and the *onus* is upon the State to remove this presumption by proper proof. When the trial judge has decided, as in this case, that the State has removed that presumption and has shown that the defendant was not injured by the misconduct of the jury, reviewing courts are loth to interfere with his finding upon that subject. This court, however, has in several cases reviewed and reversed the decision of the trial judge upon this subject,—notably in the case of *Obear* v. *Gray*, 68 *Ga.* 182. So it is not the rule in this State, as it is in some others, that the decis-

ion of the trial judge upon this question will not be reviewed or reversed. The only trouble we have had in coming to our conclusion in this case is the great respect that we have for the judgment of the able and impartial trial judge who presided in the court below. When these grounds of the motion and the affidavits in reference thereto were read to us upon the hearing of this case, the misconduct of the bailiff and the jury appeared to be so gross that our minds reached the conclusion at once that the defendant ought to have a new trial. We apprehend that the judgment of the trial judge was based upon the affidavits introduced by the State, in which the jurors swore that they were not influenced by anything they saw or heard at the meeting; his conclusion therefrom being that the defendant was not injured by the misconduct of the jury, and that he was adhering to the letter of the law in overruling the motion on these grounds. There are many things which can be done by individual members of the jury, or by the whole jury, which are susceptible of such clear explanation that the trial judge would be authorized in refusing to set the verdict aside. There are other things, however, which if done by an individual member of the jury, or by the whole jury, are so contrary to the public policy of the State in the procurement of fair and impartial trials for the citizens of the State, as to require that a verdict rendered by such jury be set aside, whether the defendant has been injured thereby or not; and in our opinion, the case under consideration belongs to this class. The State is jealous of the rights and liberties of its people. When one of its citizens is accused of crime, it throws around him all the safeguards that are possible, in order to procure him a fair and impartial trial. It requires the officer who has charge of that particular jury, to swear, in substance, in open court to take them to the jury-room and there

keep them safely, and not to communicate with them himself or suffer any one else to communicate with them, unless by leave of the court. The law contemplates that when a jury are selected and sworn to try a citizen for felony, they shall be entirely separated from the world, and that no communication whatever shall be had with them, from the beginning of the trial until the verdict is rendered, unless by leave of the court. It contemplates that no outside influence shall be brought to bear on the minds of the jury, and that nothing shall occur outside of the trial which shall disturb their minds in any way; that the minds of the jury shall be entirely occupied with the consideration of the case which they are sworn to try. Let us apply these rules to the facts in this case. Here was a defendant on trial for his life. This jury had been selected to pass upon that issue. The bailiff had been sworn to keep them separate and apart from their fellow-citizens. In violation of this oath, without permission of the judge, he took them from their room, where he had sworn to keep them, to a prayer-meeting conducted by the prosecutor in the case. When they arrived there, they were shown to their seats by the prosecutor, who provided for them a place apart from the remainder of the congregation, and who led the services and addressed the congregation. Prayers were offered for the court and its officers. How long they remained there does not appear. For aught that appears in the record the house may have been crowded. One of the grounds of the motion alleges that there was "shouting" at the meeting. What influence this shouting and religious excitement may have had upon the minds of the jury does not appear. It does not appear that Mr. Hooten, the prosecutor, was not among those who shouted. The jury seeing this going on, and seeing this prosecutor filled with religious zeal and fer-

vor, may have reasoned in their minds, and doubtless did, that this man, who was the active prosecutor of the defendant, who assisted in the selection of themselves as jurors in the case, and who testified before them as a witness, by his conduct and declaration at the prayer-meeting showed that he was a good and upright man, and that such a man would not prosecute the defendant unless he believed him to be guilty. Some of them were perhaps members of his congregation, and looked up to him as their pastor and spiritual guide. We do not say, nor do we intend to intimate, that Mr. Hooten designedly intended his actions to have an undue influence upon the jury; but who can say that they did not have this effect? Suppose that instead of the jury having been taken by the bailiff to the preacher, the bailiff had brought the preacher to the jury-room, and he had there addressed them, would any one say that this would not have been such gross misconduct as to require their verdict to be set aside? Suppose, too, that in addition to carrying the preacher to the jury-room, the bailiff had carried his congregation, and that these exercises had been held in the jury-room, would any one say that their verdict should not be set aside? What difference does it make whether the jury is carried to the preacher and the congregation, or whether the preacher and congregation are brought to the jury?

It is true that the jury say in their affidavits that these things did not influence their minds; but how can they tell—how can any man tell what particular facts and circumstances influence his judgment? *Woolfolk* v. *State*, 81 *Ga.* 551; *Smith* v. *Lovejoy*, 62 *Ga.* 373; Thompson on Trials, 962.

After mature consideration of all these facts, we think the misconduct of this bailiff and jury was so gross that the public policy of the State requires a new trial for the defendant. It was such a gross violation

of all order, decorum and decency in the trial of a case of life and death, that the verdict should be set aside, whether the defendant was injured or not. We have carefully examined the text books and reports, and we can find no case of such gross misconduct as the facts show this conduct of the jury to be. Numerous cases are cited where the verdict was set aside for conduct much less gross than this.

2. During the progress of the trial, a photograph of the place where the deceased was killed was offered and admitted in evidence. It appears from the evidence that the prosecution had procured a photograph of the locality and scene of the homicide. This photograph seems to have been taken before the trial, and persons were placed in the positions said to have been occupied by the defendant and his accomplices. It was insisted by the plaintiff in error that the court erred in admitting this photograph in evidence before the jury. The motion for a new trial fails to state that it was objected to by the defendant, or if objected to, on what grounds the objection was made. The motion says it was calculated to inflame the jury. We have examined the photograph and do not see in what respect it was calculated to inflame the jury. We do not think there was any error in admitting it, on the ground alleged in the motion. The only ground that we can see why it should have been excluded was not argued by counsel for the plaintiff in error. The evidence in the record does not positively show that the defendant's position was that shown in the photograph. Wilson testifies, it is true, that the defendant was in front of the house, but does not locate him in the position the photograph does. Hooten testified that the photograph was a correct representation of the locality, but does not undertake to testify that Shaw was in the position shown by the photograph. As a new trial is to be had, we would

suggest that the State, if it seeks to use this photograph again, prove more certainly that it represents the defendant's position at the time of the homicide, or that the picture be not used. We do not see any necessity, ourselves, for using the photograph. If Wilson is to be believed, the locality is sufficiently described in his testimony.

3. There was no error in the other grounds of the motion for a new trial, especially the first, under the explanation made by the judge in his approval thereof.

*Judgment reversed.*