**FIRST DIVISION
ELLINGTON, C. J.,
PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 29, 2013**

# In the Court of Appeals of Georgia

A12A1906. CHAMBERS v. THE STATE.

PHIPPS, Presiding Judge.

In connection with the shooting death of 17-year-old Wendell "L. J." Lewis Gilliam, Jr., Philmon Chambers, who also was 17 years of age at the time of the shooting, was charged with aggravated assault (by use of a deadly weapon), felony murder, and murder. A jury found him guilty of aggravated assault, felony murder, and voluntary manslaughter as a lesser included offense of murder. After the trial court merged the three counts, Chambers was sentenced for committing voluntary manslaughter. His motion for new trial was denied.

In this appeal, Chambers contends that the trial court erred by, among other things, denying his motion for new trial, which motion raised the issue of juror misconduct. Specifically, Chambers complained that, during deliberations, a juror

shared with her fellow jurors legal definitions, which she had found by using the Internet search engine Google; at least one such definition, Chambers argued, was incompatible with an affirmative defense he pursued at trial – defense of habitation, as it pertains to motor vehicles. Because Chambers has demonstrated on appeal that the state failed to carry its burden of proving beyond a reasonable doubt that he was not prejudiced by the juror misconduct, we reverse the trial court's denial of his motion for new trial. Chambers's remaining claims of error, for purposes of this appeal, are moot.

At the jury trial, the state called several witnesses to testify about what happened at the shooting scene. At about 10:00 p.m. on June 15, 2006, Chambers drove a Honda vehicle into the parking lot of an apartment complex. He and his passenger were following their two friends, who were in an Oldsmobile vehicle, which also had turned into the same parking lot. Standing in or near the parking lot were about 15 to 20 youngsters.

One witness called by the state was 15 years old on the evening in question and recounted that he and his friends had been at an apartment "rapping, sitting around, chilling" until about 10:00 p.m. When they walked outside, the Oldsmobile and Honda were being driven into the parking lot. L. J., who was with this witness at the

time, began arguing – "gang related or something like that" – with one of the Honda's occupants. This witness testified, "L. J. start[ed] walking towards the Honda, and he got – like, before he can get closer to the car, I seen the driver driving the [Honda] pull out a pistol and just fire one time and shot L. J., and L. J. came back running towards the breezeway," before dropping to the ground. L. J. did not have a gun, but immediately after the shot was fired, either L. J. or someone in the crowd threw a bat at the Honda.

Another witness called by the state had been L. J.'s very good friend. He testified that several of the individuals standing in or near the parking lot did not like at least one of the males in the Honda or Oldsmobile. A verbal altercation erupted. The Oldsmobile was being driven away, and L. J. approached the Honda and there were "[w]ords back to back." Then "L. J. tried to grab [the driver, Chambers], like take him out of the window, pull him out the window. But he was yanking on him, trying to pull him out of the window, and that's when [Chambers] shot one time. [L. J.] jumped . . . and took off running." But L. J. soon dropped to the ground. This witness had not seen L. J. with a gun. Meanwhile, Chambers, who had never gotten out of the Honda, drove away.

Rescue personnel responded to the shooting scene and found L. J. lying on the ground. Medical intervention failed, and L. J. died. An autopsy later showed that a bullet had entered his chest underneath his right armpit, struck his right lung, traveled through his heart, diaphragm, and spleen, then lodged into skin near the lower, left part of his rib cage. Ballistics testing showed that the bullet removed from L. J.'s body matched the gun that police had seized from Chambers's bedroom when he was arrested hours after the shooting. Expert testimony showed that the gun had been approximately three-and-a-half to four feet from L. J. at the time it was discharged. Other expert testimony showed that the nature of L. J.'s wounds was consistent with having been inflicted while he was leaning into a vehicle.

After Chambers was arrested on the night of the incident, he told the police the following in his statement. He had gone to the apartment complex looking for a particular friend, but that after stopping an individual to ask about his friend's whereabouts, approximately eight "guys" approached his car. The guys said they were members of a particular rap group and asked him and the individual whom he had just stopped whether they were members of a certain rival rap group. Chambers and the individual he had just stopped told them no. And although the guys eventually walked away, a person Chambers did not know, later determined to be L. J.,

4

came up on me and reached into my car. He grabbed me by the shirt trying to pull me out and started to hit me in my chest . . . about four times, and that's when I reached down on the floor and grabbed the gun. I then shot it out the window trying to scare the dude and get him up off of me. After the shot went off, he let go and ran away. He did not say anything, and I did not realize that it shot him.

In his defense, Chambers called at trial one witness. Chambers's witness testified that he was 20 years old on the date of the shooting and that he was friends with both Chambers and L. J. That night, this witness was the passenger in the Oldsmobile, whose driver drove into the parking lot to buy marijuana. When the two cars pulled into the parking lot, a group of people were standing at the nearby playground. The witness recounted, "We happened to run into some guys we got into an altercation with earlier." (Chambers, however, had not been involved in the earlier altercation and knew nothing about it at the time. ) Those guys were threatening to attack someone the car occupants knew, but who was not at the scene. The driver of the Oldsmobile began arguing with the crowd of about ten individuals. Chambers, however, was not involved in the argument. L. J. told the two males who had arrived in the Oldsmobile to leave. Still, no words had been spoken between L. J. and Chambers. The Honda's engine was running, and Chambers was seated in the driver's

seat. As the driver of the Oldsmobile began to drive away, L. J. walked to the driver's side of the Honda, yelled for Chambers to "Get the F out of the car" and then "just started swinging on him." About ten people ran to the car. When the shot rang out, L. J. ran from the car, and the people who had gathered about the car scattered. As this witness put it: "[I]t was going to be [Chambers] or it was going to be [L. J. and his friends]. I mean, it was going to be [Chambers] getting pulled out of the car, jumped, beat up, stomped, hit with bats. They had bats. They had all kinds of stuff. It was either going to be him messed up or it was going to be the other way around." L. J., however, had been holding no bat or any other weapon at the time he was shot.

Chambers took the stand and gave the following account. At the time in question, he had been aware that the two rap groups did not like each other and that the groups had performed songs about each other. Chambers was not a member of either group, although he had written portions of one group's rap songs. Regarding the shooting episode, he recounted that when he arrived at the parking lot, he remained seated in the Honda. About nine guys, some with bats, surrounded his car, asking the whereabouts of one of his friends; Chambers answered that he did not know. L. J. was not among them. Meanwhile, an argument erupted between the driver of the Oldsmobile and the crowd outside, and the Oldsmobile's driver got out of his

6

car. But then L. J. walked over to that driver and shook his hand, after which that driver got back into the Oldsmobile and began driving away. Chambers had put his car into reverse to back away when he noticed someone in the crowd saying something to L. J. Mumbling, L. J. walked to Chambers's side of the Honda, grabbed him, swung at him between two to four times and tried to pull him out of the car window. Chambers was strapped to the car by the seatbelt, however. L. J. next struggled to open the car door. When the car door was opened to about a forty-five degree angle, Chambers reached under his car seat, grabbed his gun with his right hand, and shot out through his open car window. At that instant, L. J. was leaning on Chambers's car door. Chambers testified, "I really felt like, I had no choice. . . . I wanted all of them away from my car. . . I was being attacked." Chambers testified that he wanted to scare L. J., and he wanted "L. J. and the rest of them to get away from my car so I could go about my business." Everyone standing near the car ran away, and Chambers drove away with his passenger. Later that night, police arrested Chambers at his home.

As further shown by defense counsel's closing argument and by the trial court's final charge to the jury, Chambers pursued, inter alia, the affirmative defenses of justification, as well as defense of habitation as applicable to motor vehicles. Upon

the return of the jury's guilty verdicts, the court proceeded with sentencing Chambers to twenty years to serve.

1. Chambers contends that the trial court erred by denying his motion for new trial on the ground of juror misconduct. Specifically, a juror injected into deliberations extra-judicial information. Chambers argues that the prosecution failed to disprove, beyond a reasonable doubt, by competent evidence, that the juror misconduct of introducing extra-judicial information did not prejudice him.

About three hours after the jury retired to deliberate, the jury sent a note to the court that asked, "May we have a copy of the definitions & requirements of charges?" The jury was brought back into the courtroom, and the court explained its general practice of not sending out with the jury a copy of any portion of the final charge, but promised to provide a copy to them the following morning, then recessed for the day, as it already was after 5:00 p.m.

The next morning, the jury reconvened in the deliberations room. The sole juror who was called to testify at the new trial hearing recounted what happened. Neither the judge nor counsel for either side was present in the jury room. The juror recalled, "We were already looking at the evidence, and then we sent word to the judge that we want what the counts meant." But before the court provided the jury the promised

8

copy of the instructions, another juror [hereinafter "Juror 38"] announced that she had conducted her own legal research and thereupon shared with the jurors various definitions. The testifying juror described the setting: all twelve jurors were "at the same table"; he was reviewing his notes; and several jurors near him were also talking. The juror testified, "I was at the other end of the table. I did not hear the entire conversation what – I heard she had looked it up. I didn't hear what counts. And when the judge then sent word of the counts, we used the counts in our final . . . deliberation."

The lawyer who had prosecuted the case against Chambers also testified at the new trial hearing. She revealed how Juror 38's misconduct came to her attention. Hours after the jury returned its verdict, Juror 38 called her. During their telephone conversation, Juror 38 said something to the effect of: "I had my Blackberry and Googled something about the law." The prosecutor ended the telephone call and, among other things, informed the trial judge about Juror 38's revelation.

At some point thereafter, investigating this issue further, the prosecutor personally interviewed all twelve jurors. Juror 38 agreed to send to the prosecutor, by email, exactly what she had found during her Internet research. The prosecutor

identified the email she received from Juror 38 as a two-page document, which was admitted in evidence at the new trial hearing as State's Exhibit No. 2.

One page of State's Exhibit No. 2 contained the entirety of OCGA § 16-3-23, concerning the use of force in defense of habitation. The trial court had *not* charged the jury on the entirety of that Code section. And particularly problematic was this sentence that appeared at the bottom of that page: "As used in Code Sections 16-3-23 and 16-3-24,[1] the term 'habitation' means any dwelling, motor vehicle, camper or other similar *shelter generally used for occupation overnight*, or place of business, and 'personal property' means personal property other than a motor vehicle."[2] That sentence was *not* a part of OCGA § 16-3-23, although OCGA § 16-3-24.1 provided: "As used in Code Sections 16-3-23 and 16-3-24, the term 'habitation' means any dwelling, motor vehicle, or place of business, and 'personal property' means personal property other than a motor vehicle." But even that Code section (OCGA § 16-3-24.1) contains *no* requirement that the "habitation" constitute "shelter generally used for occupation overnight." As made clear by cases such as *Benham v. State*,[3] "habitation"

---

[1] (Concerning use of force in defense of property other than a habitation).

[2] Emphasis supplied.

[3] 277 Ga. 516 (591 SE2d 824) (2004).

does not require a showing of "shelter generally used for occupation overnight." Correctly, the trial court's instruction concerning OCGA § 16-3-23 (the use of force in defense of habitation) did not include any such requirement.

The other page of the two-page document emailed to the prosecutor was a memo wherein Juror 38 pertinently stated:

> I did a Google search for "defense of habitation in Georgia law". The reason I conducted the online search and sent the result to my blackberry, was to *attempt to understand what was meant by "defense of habitation" and then to share it with my fellow jurors who were also unsure of what it meant as we hadn't heard the term prior to the closing arguments.* At the time of my reading of the below email to the other jurors, it was . . . prior to when the jury received the court transcript of the charges and related definitions. *The jurors discussed "defense of habitation", including the 3 stipulations and definitions.* We then received the transcript from the court and from that point until we decided the verdict, we reviewed the transcript (both aloud by the foreman and then personally when passed around the table) and used its content/definitions for our voting on each charge. . . . In no way was I attempting to alter case facts or law. Rather *my intent was to clearly understand the legal term and then to share with my fellow jurors. The jury did discuss that the defendant didn't live in his car so it wasn't a place of habitation and thusly couldn't be used as a defense.* I believe we would have ultimately come to the same verdict; however, being that

11

I shared the below information, I cannot be 100% certain that we would have.[4]

Given the foregoing, Chambers maintains on appeal that his affirmative defense of habitation "was wrongly assassinated by the petit juror's extra-judicial 'law' that if one does not live in his vehicle, he cannot defend himself inside same."

Allowing jurors to decide a case based on "law" provided by a juror during deliberations patently violates a defendant's Sixth Amendment rights not only to be present at all critical stages of his trial,[5] but also to be tried by a fair and impartial jury.[6] "It has long been recognized by the courts of this state that the guarantee of a

---

[4] Emphasis supplied.

[5] See *Peterson v. State*, 284 Ga. 275, 278-279 (663 SE2d 164) (2008) ("The United States and Georgia Constitutions both secure the fundamental right of criminal defendants to be present at all critical stages of the proceedings against them."); *Locklin v. State*, 228 Ga. App. 696, 697 (2) (492 SE2d 712) (1997) (holding that an accused is entitled to be present for, among other things, the giving of a charge to the jury).

[6] *Inman v. State*, 281 Ga. 67, 74 (6) (635 SE2d 125) (2006) ("The Sixth Amendment right to a jury trial guarantees a criminal defendant the right to a trial by an impartial jury.") (citation omitted); see *Turner v. Louisiana*, 379 U. S. 466, 471-472 (85 SCt 546, 13 LE2d 424) (1965) (explaining that the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors and that the failure to accord an accused a fair hearing violates even the minimal standards of due process) (citing Sixth Amendment). See generally *Desverges v. Goette*, 121 Ga. 65, 67 (3) (48 SE 693) (1904) ("The sanctity of the

fair and impartial jury is a central safeguard to a fair trial in our system of criminal justice."[7] As our Supreme Court recognized well over a century ago, when a jury is selected and sworn to try the criminally accused, "[the law] contemplates that no outside influence shall be brought to bear on the minds of the jury, and that nothing shall occur outside of the trial which shall disturb their minds in any way."[8] And where, as here, "misconduct of a juror or of the jury is shown,[9] the presumption is that the defendant has been injured, and the *onus* is upon the State to remove this presumption by proper proof."[10] That is, "the burden is on the prosecution to prove

---

court and the purity of trial by jury alike demand that the verdict shall not be in the slightest degree influenced or controlled by matters and conduct extrinsic to the trial.")

[7] *Lamons v. State*, 255 Ga. 511, 512 (340 SE2d 183) (1986), citing *Monroe v. State*, 5 Ga. 85 (1848).

[8] *Shaw v. State*, 83 Ga. 92, 100 (1) (9 SE 768) (1889).

[9] See *Steele v. State*, 216 Ga. App. 276, 278-279 (2) (454 SE2d 590) (1995) (finding juror misconduct, where juror copied encyclopedia's definitions of manslaughter and read her notes to jury), overruled on other grounds, *Kennebrew v. State*, 267 Ga. 400, 404 (4), n. 2 (480 SE2d 1) (1996); *Moore v. State*, 172 Ga. App. 844, 846 (324 SE2d 760) (1984) (finding juror misconduct, where juror studied Reader's Digest book on the law and told jurors what he had gotten from the book).

[10] *Shaw*, supra at 100 (1); see *Lockridge v. State*, 260 Ga. 528 (397 SE2d 695) (1990).

13

beyond a reasonable doubt that no harm has occurred."[11] A jury verdict will not be upset solely because of juror misconduct, however, "unless such conduct [was] so prejudicial that the verdict must be deemed inherently lacking in due process."[12] "Put another way, a new trial will not be granted unless there is a reasonable possibility that the improper [information] collected by jurors contributed to the conviction."[13]

In this case, to remove the presumption of prejudice that arose as a result of juror misconduct, the state introduced in evidence at the new trial hearing affidavits from all jurors except Juror 38. Each affiant stated that, in reaching the verdicts, he or she had relied upon the definitions provided by the court. Several of those eleven jurors further averred either that they did not recall any juror bringing information into the jury room during deliberations or that they did not recall what the juror who had conducted her own research had read to them. And those jurors who stated that they had heard what Juror 38 read to them gave conflicting accounts as to *what* she

---

[11] *Sims v. State*, 266 Ga. 417, 419 (3) (467 SE2d 574) (1996) (citation and punctuation omitted).

[12] *Boone v. State*, 293 Ga. App. 654, 662 (9) (667 SE2d 880) (2008) (citation and punctuation omitted); see *Sims*, supra.

[13] *Bobo v. State*, 254 Ga. 146 (1) (327 SE2d 208) (1985) (citation omitted); see *Gaines v. State*, 274 Ga. App. 575, 577 (1) (618 SE2d 197) (2005).

had read to them; their recollections varied as to whether Juror 38 had read "law" or "legal definitions" on murder and/or voluntary manslaughter and/or aggravated assault and/or defense of habitation.

The trial court rejected Chambers's claim that juror misconduct required the grant of his motion for a new trial, stating in its order: "This Court has considered [the testimony of the sole (petit) juror who testified], the affidavits of the petit jurors, and State's Exhibit 2 to the Motion for New Trial and finds the misconduct was not so prejudicial that the verdict was lacking in due process." The trial court noted further that "many of the jurors' recollection of what was read [by Juror 38] were inconsistent with each other and with State's Exhibit 2." And the trial court found, "Most significantly, all petit jurors stated that they totally relied upon the Court's instruction and not the information conveyed by [Juror 38]. There was no evidence that the juror tried to sway her fellow jurors or that the outcome of the deliberations was affected. The jury's verdict was sound."

While the trial court's ruling on this issue is entitled to deference,[14] the record constrains us to conclude that the ruling was erroneous. Even accepting that the trial court found credible the *eleven* jurors' affidavit testimony that they had not relied upon any extra-judicial information from Juror 38,[15] we find nothing in the record that allowed for such a finding for the twelfth juror, Juror 38. Undisputedly, that juror collected extrajudicial "law" that she found compelling enough to share with fellow jurors (before she herself necessarily assented to the unanimous guilty verdicts). Juror 38's email to the prosecutor was not sworn; but even if it had been, in it Juror 38 did not state that she had relied only on the court's definitions and not on her own

---

[14] *Lockridge*, supra at 529; *Gaines*, supra at 575 ("[M]otions for new trial because of improper conduct of jurors . . . are addressed to the sound discretion of the trial judge. Unless there is an abuse of discretion, the appellate court will not upset the trial judge's determination.") (citation omitted).

[15] See *Henley v. State*, 285 Ga. 500, 503-504 (2) (678 SE2d 884) (2009) (noting trial court's prerogative to ascertain credibility of affidavit on motion for new trial based on alleged juror misconduct). But see *Shaw*, supra at 101 ("It is true that the jury say in their affidavits that these things did not influence their minds; but how can they tell – how can any man tell what particular facts and circumstances influence his judgment?") (citations omitted); *Moore*, supra at 846 ("Despite the two juror witnesses' . . . protestations that the jury verdict was not actually affected. . ., this is a *conclusion* or *opinion* only and is not something to be presumed inasmuch as the misconduct cannot be ignored and [the appellate court has] no way of knowing what effect the juror's interpretations from [a book entitled *You and The Law*, published by Reader's Digest Association, Inc.] had on the others.")

16

extrajudicial information. We cannot agree with the state's contention on appeal that "there was no evidence . . . that *any* of the jurors were influenced by the extrajudicial information."[16]

The state cites the principle that where the substance of the juror communication is established without contradiction, the facts themselves may establish the lack of prejudice or harm to the defendant.[17] But as the trial court noted, "many of the jurors recollections of what was read [by Juror 38] were inconsistent with each other and with State's Exhibit 2"; and as the state concedes in its brief, "[n]one of the jurors were consistent in what definition was read." Because the substance of Juror 38's "law" was not *established* without contradiction, the cited principle is unavailing to the state.[18]

---

[16] (Emphasis supplied.)

[17] See *Holcomb v. State*, 268 Ga. 100, 103 (2) (485 SE2d 192) (1997).

[18] Cf. id. (the substance of the communication involved in an incidence of juror misconduct, having been established without contradiction, proved beyond a reasonable doubt that no harm occurred); *Sims*, supra at 420 (3) (no reversible error arising out of juror misconduct by violating court orders not to discuss the case because the substance of the communication was established without contradiction and the statements "did not involve extrajudicial information, or demonstrate that they were deliberating the case prior to the close of evidence, or that one juror was attempting to persuade another on any issue or testimony in the case"); *Henry v. State*, 265 Ga. 732, 738 (7) (a) (462 SE2d 737) (1995) (sequestered juror had

The state did not overcome, by proof beyond a reasonable doubt, the presumption of prejudice that arose in this case. The State's Exhibit No. 2, introduced in evidence at the new trial hearing, was expressly relied upon by the trial court in reaching its decision. To the extent it was not incompetent hearsay,[19] it showed that Juror 38 used her own Internet research to dispense with the defense of habitation: "the defendant didn't live in his car so it wasn't a place of habitation and thusly

unauthorized contact with girlfriend but no harm where facts established conversation did not involve discussion about the merits of the case); *Lawrence v. State*, 289 Ga. App. 163, 165-166 (1) (657 SE2d 250) (2008) (concluding that there was no reasonable probability that the juror misconduct contributed to the guilty verdict, where juror examined the injuries victim received during the charged offense, but there was no evidence that juror discussed those injuries with, or presented any other extra-judicial information to, any of the other jurors and the trial court dismissed that juror within minutes after her inappropriate contact with the victim, and it did not appear that juror had much, if any, opportunity to discuss her contact with the remaining members of the jury).

[19] See *Inman*, supra at 72 (4) (noting that hearsay evidence is admissible "in exceptional circumstances, i. e., when the hearsay bears persuasive assurances of trustworthiness and is critical to the defense," and the "[e]xclusion of hearsay testimony that meets the exceptional circumstances test violates traditional and fundamental standards of due process.") (citations omitted). See generally *Turpin v. Todd*, 268 Ga. 820, 822 (1) (a) (493 SE2d 900) (1997) (explaining that "the general prohibition against allowing a jury to impeach its verdict cannot be applied to emasculate a defendant's constitutional right to a fair trial"); *Watkins v. State*, 237 Ga. 678, 683-685 (229 SE2d 465) (1976) (explaining that the general rule that jurors are not permitted to impeach their own verdict is deeply rooted in Georgia law as it promotes important public policy considerations, but that such rule does yield to a defendant's constitutional right to a fair trial).

18

couldn't be used as a defense." What is more, the portion of State's Exhibit No. 2 that was used to so conclude was *not* consistent with Georgia law and was *not* part of the trial court's final charge to the jury. Even if State's Exhibit No. 2 is properly construed as incompetent hearsay, the state's remaining evidence nevertheless fell short of meeting *its* burden of proof, in light of the undisputed actions of Juror 38.

Whether Chambers was entitled to be acquitted based on the affirmative defense of habitation was featured prominently as a disputed issue by the presentment of evidence to the jury, the arguments of counsel, and the instructions to the jury. As the Court espoused in *Benham*,[20] OCGA § 16-3-23 (setting forth the use of force in defense of habitation)

> authorizes the use of force which is intended to cause death or great bodily injury to prevent or terminate unlawful entry into or attack upon a habitation (including a motor vehicle under OCGA 16-3-24.1) if the entry is made or attempted in a violent and tumultuous manner and there is a reasonable belief that the entry is made for the purpose of assaulting or offering personal violence to any person therein.[21]

---

[20] Supra.

[21] Id. at 517 (punctuation omitted).

19

In this case, the evidence authorized a finding that, at the time Chambers inflicted L. J.'s fatal wound, L. J. was unlawfully entering, or attempting to enter, Chambers's car in a violent and tumultuous manner for the purpose of assaulting Chambers or offering him personal violence.[22] Considering the evidence produced by the state at trial, the affirmative defenses pursued by Chambers, the jury's request for supplemental instructions hours after retiring to deliberate, Juror 38's usurping the province of the trial court by presenting fellow jurors with "law" she found using Google to search the Internet, together with the evidence adduced at the new trial hearing,

> we find that there is at least a reasonable possibility that the [extra-judicial information] contributed to the conviction and that the verdict must therefore be deemed inherently lacking in due process. This misconduct cannot be ignored and requires a reversal of the judgment based on the jury's verdict in this case.[23]

---

[22] See *Hammock v. State*, 277 Ga. 612, 615 (3) (592 SE2d 415) (2004) ("Unlike the defense of justification, the habitation defense . . . allows the use of deadly force in certain situations even if the occupant does not fear death or great bodily injury."); *Benham*, supra (explaining that defense of habitation may justify the use of deadly force even if that amount of force was not necessarily required to repel an unlawful attack upon one sitting in a motor vehicle).

[23] *Bobo*, supra at 148 (1) (citations omitted); see *Hammock*, supra at 614 (2) (finding a reasonable possibility that juror misconduct contributed to the accused's conviction, where juror misconduct affected key issue of affirmative defense and

Accordingly, the trial court abused its discretion in denying Chambers's motion for a new trial.

2. Chambers also enumerates as error: (a) the trial court's failure to instruct the jury, sua sponte, on the absence of the duty to retreat; and (b) the trial court's rejection of his claim that his trial counsel rendered ineffective assistance by failing to submit a written jury instruction that the prosecution had the burden to disprove beyond a reasonable doubt affirmative defenses. Regarding the latter, the transcript shows that the trial court did instruct the jury on that principle, but Chambers asserts that the instruction given was confusing.

Because our holding in Division 1[24] renders these claims of error moot and because the propriety of the jury charges upon a retrial will depend upon the facts thereupon developed, we need not address these claims of error relating to Chambers's first trial.[25]

---

verdict became unanimous only after the introduction of the improper evidence); *Steele*, supra; *Moore*, supra.

[24] Supra.

[25] See generally *Steele*, supra at 279 (6).

3. "Because the evidence [met] the standard of *Jackson v. Virginia*,[26] the case may be retried."[27]

*Judgment reversed. Ellington, C. J., concurs. Dillard, J., concurs in judgment only.*

---

[26] 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[27] *Lively v. State*, 262 Ga. 510, 512 (3) (421 SE2d 528) (1992).