309 Ga. 273
FINAL COPY

S20A0216.  BURNEY v. THE STATE.

BETHEL, Justice.

A Jones County jury found Terrence Sanchez Burney guilty of malice murder and other offenses in connection with the death of Joseph Kitchens. Burney appeals, arguing that the evidence presented against him was insufficient to support the jury's verdict on the malice murder charge, that the trial court erred by not conducting a hearing pursuant to *Faretta v. California*, 422 U. S. 806 (III) (A) (95 SCt 2525, 45 LE2d 562) (1975), that the trial court abused its discretion by admitting testimony from the medical examiner as to the cause of the victim's death, that he was denied his right to a speedy trial, and that he should be granted a new trial because a juror conducted Internet research relevant to the case during deliberations. Finding no error, we affirm.[1]

---

[1] The crimes occurred between October 11 and October 17, 2008. On February 10, 2011, a Jones County grand jury indicted Burney and Tyrone

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. The victim, Kitchens, was a 76-year-old retired man who lived alone. Burney and Tyrone Richardson both lived less than a mile from Kitchens.

In October 2008, Burney told several of his friends, including

---

Richardson for malice murder (Count 1), felony murder predicated on false imprisonment (Count 2), felony murder predicated on burglary (Count 3), armed robbery (Count 4), false imprisonment (Count 5), and burglary (Count 6). The grand jury also indicted Burney for misdemeanor possession of marijuana (Count 7). Burney moved in limine to sever Count 7, and the court granted that motion.

On August 29, 2011, the State filed a notice announcing its intention to seek the death penalty. On July 29, 2013, Richardson pled guilty to each count against him and was sentenced to a term of life imprisonment with the possibility of parole and concurrent sentences on the armed robbery, false imprisonment, and burglary counts. His case is not part of this appeal. On March 13, 2015, the State withdrew its notice of intention to seek the death penalty against Burney.

After a jury trial of Burney held from April 27 to May 1, 2015, the jury found him guilty of Counts 1 through 6. On May 15, 2015, the trial court sentenced Burney to a term of life imprisonment without parole for malice murder, a consecutive term of life imprisonment for armed robbery, a consecutive term of imprisonment of 10 years for false imprisonment, and a consecutive term of imprisonment of 20 years for burglary. The trial court purported to merge the felony murder counts into the malice murder count, but those counts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993).

On June 15, 2015, Burney filed a motion for new trial, which he subsequently amended on December 7, 2017. The trial court held a hearing on the motion, as amended, and on June 20, 2019, denied the motion. Burney filed a notice of appeal on July 15, 2019. This case was docketed to this Court's term beginning in December 2019 and submitted for a decision on the briefs.

Richardson, that he needed money and was going to rob someone. On October 11, Burney saw Kitchens leave his house in his car. Burney told Richardson to come with him, and they walked to Kitchens' house carrying a hammer and a roll of duct tape. Richardson also brought his pistol. Richardson testified at trial that they planned to steal guns from Kitchens and sell them.

Burney and Richardson pried the back door of Kitchens' house open. Once inside, they took four rifles that belonged to Kitchens. They then ransacked Kitchens' house for over 30 minutes until they noticed Kitchens arriving home. Burney and Richardson waited for Kitchens in the back of the house. Richardson gave his pistol to Burney, and as Kitchens walked around the house to the back door, Burney pulled the pistol on Kitchens and told him that he would shoot him if he was not quiet. Burney held Kitchens at gunpoint while Richardson taped Kitchens' hands behind his back.

As Burney was taking Kitchens inside the house, Richardson left and did not return. Richardson next saw Burney two days later. Burney told Richardson that he had taped Kitchens to a chair, hit

him "a few times," and then left with the rifles they had found in Kitchens' house. Burney returned Richardson's pistol to him and gave him Kitchens' rifles, which he instructed him to sell. Richardson put the pistol and rifles in his car.

The next day, Richardson was driving when he was stopped by a police officer on suspicion of DUI. Richardson gave the officer permission to search his car, and the officer found a handgun and a shotgun in the car's cabin and four long guns in the trunk. Richardson initially said that the guns were not his but later told the officer that he got them from Burney. Richardson was arrested and brought to the sheriff's department where he gave a written statement to that effect. Richardson was released from jail the next morning. Richardson saw Burney the next day and told him that the police had seized the guns from his car.[2]

---

[2] When officers later searched Kitchens' house, they found ammunition that was of the same caliber as the rifles that were seized from Richardson. Later in the investigation, members of Kitchens' family provided law enforcement with two rifle boxes that had belonged to Kitchens. The make, model, and serial numbers of the rifles that had been in those boxes matched two of the rifles that were seized from Richardson.

Kitchens' sister, Mattie Alexander, regularly called and visited Kitchens. On October 17, 2008, after not hearing from him for several days, she went to his house. He did not answer when she knocked on his front door, and he did not answer her calls. Alexander called her cousin, Louis Pounds, who contacted law enforcement officers and asked them to perform a welfare check on Kitchens.

Officers responded to the welfare check at Kitchens' residence and upon inspecting the house noted that the back door had been pried open. One officer who went inside encountered flies and the "overpowering" smell of decomposition. The officers found Kitchens' body inside the house. He was wrapped in duct tape, which attached him to an overturned dining room chair. The duct tape wrapped his hands behind his back and covered his body from his shoulders to his stomach. The officers found a mattress that had been overturned, a cash box that had been broken open, a broken file cabinet, and items from Kitchens' wallet that had been dumped into a toilet. Investigators also found several bottles of various

medications belonging to Kitchens throughout the house, including on the dining room table. Kitchens' wallet, car keys, and cell phone were missing and were never located.

While the officers were searching Kitchens' house, Pounds began driving there. On the way, he happened to encounter Burney, whom he knew, standing on the side of the road. Pounds offered Burney a ride, and the two drove toward Kitchens' house. While in the car, Burney asked Pounds if anything had happened on the street where Kitchens lived. Pounds told Burney that he had learned that Kitchens had just been found in his home unresponsive. Burney responded that Pounds should get in touch with Richardson because he had been found with guns earlier in the week. As they neared Kitchens' neighborhood, Burney said to Pounds, "I probably don't need to go down that road." Pounds then dropped off Burney near Burney's grandmother's house.

Kitchens suffered from hypertension and diabetes, for which he took prescribed medications. His physician testified that Kitchens would be at risk of severe health complications if he were

to go several days without taking his diabetes medication. An October 18 autopsy of Kitchens revealed that he died due to prolonged physical restraint, and that the lack of access to food, water, and his prescribed medications complicated the hypertension and diabetes from which he suffered. The medical examiner testified that there were no signs that Kitchens suffered any gunshot wound, stab wound, or blunt force trauma. The medical examiner testified that the body's state of decomposition indicated that he had been dead for five to six days at the time of the October 18 autopsy. The medical examiner determined that the manner of death was homicide.

Burney and Richardson were arrested the day that Kitchens' body was discovered. While incarcerated, they both discussed the incident at Kitchens' house with cellmates. When asked whether he was guilty, Burney told one cellmate, "Let's just say the warrants are dead on." Burney told that cellmate that he and Richardson held Kitchens at gunpoint, "taped him up," and then took things from the house, including guns and about $80,000 in cash. In regard to

Kitchens, Burney told the cellmate, "[H]e's just an old man. He get what he get."

Burney told another cellmate the following. He and Richardson had been watching Kitchens' house and were planning to take guns and money from him to buy drugs. After they found four guns and some credit cards, Kitchens came home. Burney held Kitchens at gunpoint and said "shut up, before I shoot you." During the altercation, Kitchens "kept hollering about his medicine" but was told to "shut up." Burney and Richardson later returned to Kitchens' house "to move the body" but ultimately did not go back into the house. Burney and Richardson also discussed burning the house down.

Burney told a third cellmate that he and Richardson planned "to go in and rob the old man" because they suspected he had money hidden in the house. Burney said that, a few days after they robbed Kitchens, he and Richardson returned to the house to take Kitchens out of the house, put him in the trunk of a car, and burn the car. They decided against doing so because Burney did not want to have

anything to do with "touching a dead man." Burney and Richardson also considered burning Kitchens' house but decided against it. Burney bragged about what he and Richardson did to Kitchens.

Burney contends that the evidence presented against him was insufficient to support the jury's verdict on the malice murder count. In addition, although not raised as error, as is this Court's practice, we review the sufficiency of the evidence for the other crimes for which Burney was found guilty and sentenced: armed robbery, false imprisonment, and burglary.

(a) As to the malice murder count, Burney argues that the State did not prove that Burney acted with either express or implied malice to kill Kitchens when he and Richardson broke into Kitchens' home, robbed him at gunpoint, and taped him to a chair. Burney argues that none of these actions were capable of producing the violence necessary to end a human life and that they therefore cannot support a conviction for malice murder, citing this Court's decision in *Parker v. State*, 270 Ga. 256, 259-260 (4) (507 SE2d 744) (1998), overruled on other grounds by *Linson v. State*, 287 Ga. 881,

886 (4) (700 SE2d 394) (2010). We disagree.

When evaluating the sufficiency of evidence as a matter of due process under the Fourteenth Amendment to the United States Constitution, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013).

The crime of malice murder is committed when a person "unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). OCGA § 16-5-1 (b) provides:

> Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an

abandoned and malignant heart.

As we noted in *Parker*, "implied malice," as employed in OCGA § 16-5-1 (b), "is a term which has been defined to mean conduct exhibiting a reckless disregard for human life." (Citation and punctuation omitted.) 270 Ga. at 260 (4). As we went on to discuss,

> [e]xtremely negligent conduct, which creates what a reasonable man would realize to be not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to another or to others — though unaccompanied by any intent to kill or do serious bodily injury — and which actually causes the death of another, may constitute murder. . . . [R]eckless disregard for human life may be the equivalent of a specific intent to kill. Evidence that the defendant acted in reckless disregard for human life is, for purposes of demonstrating his guilt of the crime of malice murder, as equally probative as evidence that he acted with a specific intent to kill.

(Citations omitted.) Id.

Here, the evidence showed that Burney and Richardson broke into and ransacked Kitchens' house and stole his belongings while he was away. When Kitchens returned to the house, Burney and Richardson held him at gunpoint outside and threatened to shoot him as they taped his hands behind his back. Burney then brought

Kitchens inside the house where he taped him to a chair. Burney and Richardson left the house and never returned to free Kitchens from restraint.

In addition to evidence of these acts, the jury heard evidence that Burney and Richardson were aware that Kitchens was advanced in age and that he took a number of medications. When police searched Kitchens' home, they found medication bottles throughout the house, including on the dining room table near where Kitchens' body was found taped to a chair, and the jury could infer that Burney saw them. The evidence also showed that, after his arrest, Burney told one of his cellmates that Kitchens "kept hollering about his medicine" but was told to "shut up." From this evidence, particularly given that Kitchens lived alone, the jury could infer that Burney and Richardson were aware that restraining Kitchens placed him in danger.

Moreover, evidence of his subsequent actions established that Burney exhibited no regard for Kitchens' well-being. He did not return to the house to free Kitchens or summon help for him.

Instead, Burney and Richardson discussed returning to the house to move Kitchens' body and also contemplated burning Kitchens' house and car. These plans were discarded due to Burney's apparent reluctance to touch a dead body. The evidence also showed that Burney discussed Kitchens' death with several of his cellmates, who testified that Burney "bragged" about what he and Richardson had done to Kitchens and that, as to Kitchens, Burney said, "He's just an old man. He get what he get." In addition to demonstrating Burney's indifference toward Kitchens' well-being, this evidence supports an inference that Burney was aware that his actions could result in Kitchens' death.

Based on the evidence presented at trial and summarized above, a rational trier of fact could find that no considerable provocation appeared from the evidence and that Burney's acts demonstrated such reckless disregard for human life that implied malice was established to support the conviction for malice murder. See *Browder v. State*, 294 Ga. 188, 191 (1) (751 SE2d 354) (2013). As the evidence further authorized the jury to find that Burney's acts

caused Kitchens' death, the evidence was sufficient to authorize a rational trier of fact to find Burney guilty of malice murder beyond a reasonable doubt. Id. See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

(b) We have reviewed the evidence presented at trial as to the remaining counts for which Burney was found guilty and sentenced. We conclude that the evidence was sufficient to support the jury's verdicts as to those counts. *Jackson*, 443 U. S. at 319 (III) (B).

2. Burney next contends that the trial court erred by not conducting a *Faretta* hearing. We disagree.

The right of a criminal defendant to self-representation is guaranteed by the Sixth Amendment to the United States Constitution. See *Wiggins v. State*, 298 Ga. 366, 368 (2) (782 SE2d 31) (2016); see also *Faretta*, 422 U. S. at 819 (III) (A) ("Although not stated in the [Sixth] Amendment in so many words, the right to self-representation — to make one's own defense personally — is . . .

necessarily implied by the structure of the Amendment.").[3]

> To avail himself of this right, a defendant must clearly and unequivocally assert his desire to represent himself. If an unequivocal invocation is made, it must be followed by a hearing to ensure that the defendant knowingly and intelligently waives the traditional benefits associated with the right to counsel and understands the disadvantages of self-representation so that the record will establish that he knows what he is doing and his choice is made with eyes open.

(Citations and punctuation omitted.) *Oliver v. State*, 305 Ga. 678, 680 (2) (827 SE2d 639) (2019).

At Burney's arraignment held on January 27, 2011, the trial court encouraged Burney, who at that time was proceeding pro se, to retain counsel or apply for appointed counsel. Burney replied to the trial court that he understood what he was facing and that "as of right now" he was going to "keep going" pro se. At a subsequent hearing held in December 2011, after the State had given notice that

---

[3] Burney raised this claim exclusively under the Sixth Amendment to the United States Constitution. We note, however, that the Georgia Constitution also affords a defendant the right to self-representation. See *Wiggins*, 298 Ga. at 368 (2); Ga. Const. of 1983, Art. I, Sec. I, Par. XII ("No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state.").

it planned to seek the death penalty against Burney, Burney met with attorneys from the office of the Georgia Capital Defender and agreed to be represented by them. Attorneys from that office have represented Burney in this case since that time, including at trial.

Burney argues that he invoked his right of self-representation at his arraignment and that the trial court erred by not conducting a *Faretta* hearing based on Burney's comments to the trial court about representing himself. But Burney's statement to the trial court that "as of right now" he was comfortable proceeding pro se was not an unequivocal invocation of his right to self-representation, as the statement suggested that Burney might reconsider that decision as his case progressed. Although Burney now argues that he would have proceeded pro se throughout his case had the trial court determined at some point that he had made an intelligent, knowing, and voluntary waiver of his right to counsel, the record reflects that Burney accepted the representation of counsel eight months later and proceeded through the rest of the proceedings in the case with that same counsel. See *Oliver*, 305 Ga. at 680-681 (2)

("Acquiescence to the substantial participation by counsel . . . obliterates any claim that the participation in question deprived [appellant] of control over his own defense." (citation and punctuation omitted)). For these reasons, this enumeration of error fails.

3. Burney also argues that the trial court erred by denying his motion to exclude the testimony of the medical examiner as to the cause of Kitchens' death. We disagree.

In a report completed approximately two months after Kitchens' death in 2008, the medical examiner determined that Kitchens died as the result of prolonged physical restraint that complicated his hypertension and diabetes, basing her findings, in part, on medical records provided to her by Kitchens' physician. The medical examiner classified Kitchens' death as a homicide.

As part of reciprocal discovery, the State provided the medical examiner's report to Burney sometime between March 27, 2012, and

February 21, 2013.[4] The State also included the medical examiner's name and contact information on its initial witness list filed on June 13, 2013. On February 20, 2014, Burney's counsel sent a letter to the prosecutor acknowledging receipt of the medical examiner's report but noting that Kitchens' medical file that had been reviewed by the medical examiner and referred to in her report was not included with the report. On May 13, 2014, the prosecutor informed Burney's counsel that she was not in possession of Kitchens' medical file and that it had been provided to the medical examiner directly by Kitchens' physician.[5] The prosecutor further informed Burney's counsel that the GBI crime lab had shredded the file "due to the amount of time that has passed," noting that the practice of the GBI crime lab was to destroy anything that had been in its possession for

---

[4] Burney acknowledged receiving discovery from the State on March 27, 2012, April 10, 2012, April 16, 2012, May 30, 2012, and February 21, 2013. It is not clear from the record on which of those dates the medical examiner's report was provided to Burney.

[5] At trial, Kitchens' physician testified that he was no longer in possession of Kitchens' medical records. He testified that he decided to leave his medical practice in 2009 and that he contacted each of his patients to give them an opportunity to claim their records. After some time, any records that had not been claimed were destroyed. The physician testified that he could not remember what happened to Kitchens' records.

more than five years.

On April 15, 2015, Burney moved in limine to exclude the testimony of the medical examiner, arguing that the admission of the testimony would violate his rights under the "Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and . . . Article I, Section I, Paragraphs I, II, XI, XII, and XXVIII of the [Georgia] Constitution." The trial court later held a hearing on the motion. The same day, the State supplemented its witness list to include Kitchens' physician who had provided Kitchens' medical records to the GBI. The State also argued that the medical examiner should be permitted to testify. Specifically, the State noted that Burney would have the opportunity to cross-examine the medical examiner regarding the basis of her opinions, that OCGA § 24-7-703 specifically contemplated that she could testify about the facts or data that had been "made known" to her and formed the basis of her opinion, that the absence of the medical records went to the weight, not the admissibility, of her testimony, and that no violation of *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963),

occurred because there was no indication that the medical records contained exculpatory evidence. The State also noted that it planned to call Kitchens' physician to testify at trial.

The trial court later denied Burney's motion to exclude the medical examiner's testimony. The trial court determined that, although the testimony partially depended on hearsay contained in Kitchens' medical records, such records were the type of evidence on which an expert can rely. The trial court reasoned that the basis of the medical examiner's testimony was a proper subject for cross-examination and that the jury could determine the appropriate weight to apply to that testimony. The trial court also determined that the admission of the medical examiner's testimony would not violate Burney's rights under *Brady*.

At trial, the medical examiner presented her findings to the jury. Kitchens' physician also testified about the health conditions from which Kitchens suffered and the medications he took to treat those conditions. Both witnesses were cross-examined by Burney.

Burney now argues that, without the medical records

underlying the medical examiner's conclusions regarding the cause of Kitchens' death, he was deprived of the ability to effectively cross-examine the medical examiner or to challenge the State's theory that Kitchens died because Burney denied him access to nourishment and medication. Burney further argues that, because the issue of causation was among the key issues in the case, had the medical examiner not been permitted to testify, it is likely that the outcome of the case would have been different. Burney appears to argue generally that the admission of the medical examiner's testimony violated his rights under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment, and he specifically argues that the destruction of the medical records constituted a *Brady* violation. We consider each contention in turn.

(a) The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right

. . . to be confronted with the witnesses against him[.]"[6] "With respect to the right to confrontation, the Sixth Amendment provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." (Citation and punctuation omitted.) *State v. Burns*, 306 Ga. 117, 121 (2) (829 SE2d 367) (2019). Here, because both the medical examiner and Kitchens' physician testified about Kitchens' medical history and were subject to cross-examination, Burney has failed to show that his right to confront these witnesses was violated.

(b) Burney also argues that, under the United States Supreme Court's decision in *Crane v. Kentucky*, 476 U. S. 683 (106 SCt 2142, 90 LE2d 636) (1986), the trial court's decision to allow the medical examiner to testify on the basis of medical records that were destroyed by the State and never provided to Burney deprived him

---

[6] We note that Article I, Section I, Paragraph XIV of the Georgia Constitution also provides, in relevant part, that "[e]very person charged with an offense against the laws of this state . . . shall be confronted with the witnesses against such person." However, because Burney has only raised a claim under the Confrontation Clause of the Sixth Amendment, we limit our review to that claim.

of a meaningful opportunity to present a complete defense. But *Crane* dealt with whether a criminal defendant is permitted to introduce evidence at trial regarding the circumstances of his interrogation by police, specifically evidence as to the voluntariness and credibility of the confession. Id. at 687 (II). Because this enumeration of error does not concern any confession given by Burney to police, *Crane* is plainly inapposite to these issues. Moreover, Burney was not prohibited from probing the basis of the medical examiner's testimony or from attacking her credibility. Both her testimony and that of Kitchens' treating physician were presented to the jury, and both witnesses were subject to cross-examination. Burney has thus failed to articulate how he was deprived of an opportunity to present his defense by the trial court's decision to permit the medical examiner to testify.

(c) We now consider whether the destruction of the medical records by the State constituted a *Brady* violation. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U. S. at 87. To prevail on a *Brady* claim, Burney was required to show that

> (1) the State possessed evidence favorable to his defense; (2) he did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

(Citation and punctuation omitted.) *Danforth v. Chapman*, 297 Ga. 29, 30 (2) (771 SE2d 886) (2015).

"Evidence is not regarded as 'suppressed' by the government when the defendant has access to the evidence before trial by the exercise of reasonable diligence." *State v. James*, 292 Ga. 440, 442 (2) (738 SE2d 601) (2013). Here, the record shows that Burney received the medical examiner's report sometime between March 27, 2012, and February 21, 2013, and he learned that the State planned to call the medical examiner as a witness at trial on June 13, 2013. But Burney did not inquire about the medical records referenced in the report until February 20, 2014. The record thus shows that

Burney waited at least a year to request Kitchens' medical records from the latest date he could have received the medical examiner's report and over eight months after the State indicated that the medical examiner would be called as a witness. The record thus shows that Burney was not reasonably diligent in seeking access to the medical records. See *Cain v. State*, 306 Ga. 434, 438-440 (3) (831 SE2d 788) (2019) (no *Brady* violation where defendant was aware of the existence of evidence and took no steps to secure it in a timely manner); *James*, 292 Ga. at 441-442 (2) (defendant did not exercise reasonable diligence where pagination of medical examiner's report alerted defendant that pages were missing but defendant took no steps to obtain additional pages).

Moreover, Burney merely speculates as to how the medical records would have aided him, and he offers no evidence that anything contained in the medical records might have differed from the testimony about those records or Kitchens' medical history that was presented at trial. As we have recently discussed,

> [t]he mere possibility that an item of undisclosed

information might have helped the defense is not enough to establish the fourth *Brady* factor. Because [Burney] presents no evidence in support of his speculation and conjecture about how the allegedly undisclosed evidence would have been favorable to him, he fails to establish a reasonable probability that the outcome of his trial would have been different had any such evidence been disclosed.

(Citations and punctuation omitted.) *Mitchell v. State*, 308 Ga. 855, 862 (2) (b) (838 SE2d 847) (2020). This enumeration of error therefore fails.

4. Burney also argues that his right to a speedy trial was violated. On March 20, 2014, nearly five-and-a-half years after he was arrested in connection with Kitchens' death, Burney filed a pre-trial motion to dismiss the indictment on speedy trial grounds. On June 18, 2014, the trial court denied that motion, determining that, although the delays in the case up to that point were presumptively prejudicial, the delays were primarily attributable to Burney, Burney delayed in asserting his right to a speedy trial, and the delays in the case had not actually prejudiced him. After Burney was found guilty of malice murder and other offenses, he again raised this issue in his motion for new trial. The trial court again rejected

his speedy trial claim, determining that it had not erred by denying his pre-trial motion to dismiss and that the additional delays between its ruling on that motion and the start of Burney's trial did not violate his right to a speedy trial.[7]

On appeal, Burney argues that the delays in the case prejudiced him because his lengthy incarceration caused him to suffer from heightened anxiety and because the State used the period between his arrest in October 2008 and September 2011 to build a case against him by interviewing his cellmates and executing a plan to elicit incriminating statements from him regarding another murder for which he had been charged. He also argues that the delay resulted in the destruction of Kitchens' medical records that had been relied upon by the medical examiner in assessing the cause of death and that his defense was prejudiced as a result. For the reasons set forth below, we see no abuse of the trial court's

---

[7] In denying Burney's motion for new trial on this ground, the trial court adopted the findings of fact it had made in denying Burney's pre-trial motion to dismiss the indictment. It made additional findings of fact relating to the delay in the case between the trial court's ruling on the pre-trial motion and the start of Burney's trial.

discretion in determining that Burney was not denied his right to a speedy trial.

The United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial," U. S. Const. Amend. VI, and the Georgia Constitution likewise guarantees that, "[i]n criminal cases, the defendant shall have a public and speedy trial[.]" Ga. Const., Art. I, Sec. I, Par. XI (a). The principles set forth in *Barker v. Wingo*, 407 U. S. 514 (92 SCt 2182, 33 LE2d 101) (1972), and *Doggett v. United States*, 505 U. S. 647 (112 SCt 2686, 120 LE2d 520) (1992), guide a court in its consideration of whether a delay in bringing an accused to trial amounts to a denial of his right to a speedy trial. Those principles apply equally to a claimed denial of the right to a speedy trial under both the United States Constitution and the Georgia Constitution. *Redd v. State*, 261 Ga. 300, 301 n.1 (404 SE2d 264) (1991).

As we have explained, applying the principles set forth in *Barker* and *Doggett*,

[c]ourts examining an alleged denial of the constitutional right to a speedy trial first must consider whether the interval between the defendant's arrest, indictment, or other formal accusation and the trial is sufficiently long so as to be characterized as presumptively prejudicial. If the delay is long enough to invoke the presumption of prejudice, the trial court must balance four factors: (1) whether the delay before trial was uncommonly long, (2) whether the government or the criminal defendant is more to blame for the delay, (3) whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice as the delay's result.

(Citations and punctuation omitted.) *Cash v. State*, 307 Ga. 510, 513 (2) (a) (837 SE2d 280) (2019).

In Georgia, the application of these principles to the circumstances of a particular case is a task committed principally to the discretion of the trial courts, and it is settled law that our role as a court of review is a limited one. . . . [W]e must accept the factual findings of the trial court unless they are clearly erroneous, and we must accept the ultimate conclusion of the trial court unless it amounts to an abuse of discretion, even though we might have reached a different conclusion were the issue committed to our discretion.

(Citations omitted.) *State v. Buckner*, 292 Ga. 390, 391 (738 SE2d 65) (2013).

(a) *Length of Delay*. The right to a speedy trial attaches at the time of arrest or formal accusation or indictment, whichever occurs

first, and the courts measure the delay from the time the right attaches. *Scandrett v. State*, 279 Ga. 632, 633 (1) (a) (619 SE2d 603) (2005). Such time then runs until the date on which the defendant's trial begins. *Christian v. State*, 281 Ga. 474, 476 (2) (640 SE2d 21) (2007). Burney was arrested in October 2008, and his trial began in April 2015. As the State concedes, this delay of roughly six-and-a-half years is presumptively prejudicial, and the trial court was correct to weigh the length of the delay against the State.[8] Id. See also *Sosniak v. State*, 292 Ga. 35, 41 (3) (734 SE2d 362) (2012) (delay of more than five years presumptively prejudicial and should be weighed against the State).

(b) *Reasons for the Delay*. The trial court attributed the delays in this case primarily to Burney. We see no abuse of discretion in that determination.

---

[8] We note that, both in his motion for new trial and on appeal, Burney has not asked either the trial court or this Court to consider the delays between the denial of his motion to dismiss in June 2014 and the start of his trial in April 2015. Nevertheless, as the trial court did in ruling upon Burney's motion for new trial, we have included those additional ten months in calculating the length of the delay in bringing this case to trial. See *Christian*, 281 Ga. at 476 (2).

> Whether the defendant or the State bears the primary responsibility for delay in reaching trial is pivotal in evaluating the strength of a constitutional speedy trial claim, as it can color the consideration of all other factors. Deliberate delay is weighed heavily against the State. Delay resulting from neutral causes, such as negligence, has lighter weight. Of course, delay caused by the defense weighs against the defendant.

(Citations and punctuation omitted.) *Sosniak*, 292 Ga. at 41 (3).

In considering Burney's motion for new trial, the trial court divided the delays in the case into four discrete time periods: (1) the period from Burney's arrest in October 2008 to his arraignment in January 2011, (2) the period between Burney's arraignment and the entry of appearance by his counsel from the office of the Georgia Capital Defender, (3) the period between the entry of counsel's appearance and the filing of the motion to dismiss on speedy trial grounds, and (4) the period between the filing of that motion and the beginning of Burney's trial.

As to the first time period, the State accepted responsibility for the delay between Burney's October 2008 arrest and his original indictment on April 16, 2009, a period of roughly six months. It

argued that the remaining delays in the case until Burney's January 2011 arraignment should be attributed to the actions of Richardson's counsel, who sought a number of continuances in the case during that period as she worked to negotiate a plea deal. The trial court found that because Burney had not moved to sever the case, he acquiesced to the continuances sought by Richardson's counsel, and it attributed the delays in the case after August 24, 2009 (when Richardson's counsel first moved for continuance) to Burney. The trial court attributed only the 11 months between Burney's arrest and the first motion for continuance to the State. These findings were supported by the record.[9]

Next, the trial court considered the period between Burney's January 2011 arraignment and the entry of appearance filed by his

---

[9] After Burney and Richardson were jointly indicted for Kitchens' murder on April 16, 2009, Richardson obtained counsel, but Burney did not. This case then appeared on 13 court calendars between July 2009 and November 2010. During that time, the case was continued four times at the request of Richardson's counsel. At the direction of the district attorney, Burney was not transported to the court from the jail for any of the scheduled court appearances between October 2008 and November 2010. In November 2010, the State moved to continue the case because neither Burney nor Richardson had been arraigned. Burney did not appear at that hearing.

counsel.[10] The trial court noted that, on February 10, 2011, the original indictment against Burney was dismissed, and Burney and Richardson were re-indicted for both the murder of Kitchens and a separate murder. Burney and Richardson were scheduled to be arraigned in March 2011, but the trial court continued the arraignment. Richardson's counsel then requested an additional continuance in April 2011 in order to continue seeking a plea deal. Burney did not accept a plea offer from the State, and the State filed its notice of intent to seek the death penalty against Burney in August 2011. The case was then assigned to a new judge. Attorneys from the office of the Georgia Capital Defender entered appearances on behalf of Burney in December 2011 and January 2012.

The trial court attributed none of the delays during this period to the State. The State requested no continuances during this period, and the trial court attributed this period of delay to the

---

[10] Burney made his initial court appearance on the murder charges relating to Kitchens' death on January 27, 2011. As discussed in Division 2, above, during that appearance, Burney appeared pro se and declined to hire counsel despite the trial court's admonishment that he do so.

continuance sought by Richardson's counsel, the assignment of the case to a new judge, and the appointment of counsel for Burney after the State indicated that it would seek the death penalty. The record supports these findings.

The trial court attributed all delays thereafter to Burney. It noted that because he was represented by attorneys from the Georgia Capital Defender, delays in cases due to scheduling conflicts were common due to statewide demands placed on attorneys from that office and that delays had occurred in this case for that reason.[11] The trial court also noted that, on March 20, 2014, the day Burney filed his motion to dismiss on speedy trial grounds, Burney's counsel indicated that they were not yet ready to try the case. Following the denial of Burney's motion to dismiss three months later, Burney was

---

[11] Burney's attorneys gave notice of a number of scheduling conflicts and leaves of absence throughout 2012. In July 2013, the trial court inquired whether Burney's counsel could be prepared for an October 28, 2013 trial date. Burney's counsel indicated that they could not. Because the State was still pursuing the death penalty against Burney, the trial court attempted to schedule hearings pursuant to the Unified Appeal Procedure. Burney's attorneys indicated that they could not be available in September 2013, October 2013, or February 2014 for hearings and that they would not be ready to proceed to trial in April 2014 or October 2014.

ordered to complete a competency evaluation. The evaluation showed that he was not competent to stand trial. Burney was later reevaluated and found competent to stand trial on April 24, 2015. His trial began three days later.

Despite the trial court's findings and determinations, Burney argues that the State was responsible for many delays in the case and that it used those delays to continue building its case against him. Specifically, Burney notes that while he was incarcerated between his October 2008 arrest and September 2011, the State worked to obtain evidence from Burney's cellmates and engaged in investigative tactics aimed at eliciting incriminating statements from Burney in regard to an unrelated murder charge.[12] However,

---

[12] While Burney was incarcerated at various facilities between October 2008 and January 2011, detectives interviewed several of Burney's cellmates about information Burney had given to them about his case. Five of those inmates were later called to testify against Burney at trial. In April 2010, a Jones County detective leased a post office box under the name "D. Clayton" and then used that alias and address to correspond with Burney while he was in jail. In a series of letters, the detective posed as a female "root doctor" and spiritual advisor in an effort to elicit incriminating statements from Burney regarding a different murder investigation. According to the detective, the letters sent to Burney instructed him to provide information concerning the other murder that only the killer would know. The letters suggested to Burney

the trial court made no finding of fact that the State engaged in any deliberate effort to delay progress in this case in order to buy time for those efforts to play out.

To the contrary, as noted above, the trial court determined that some delays in the case were due to the granting of continuances requested by Richardson's counsel, which automatically continued the entire case because Burney had not moved to sever the case. The trial court, in ruling on Burney's pre-trial motion to dismiss, also

---

that, if he was "honest" and confessed, "a spell would be cast and he would walk out of jail." The detective testified that he pursued this scheme with the approval of the district attorney's office and that he updated someone in that office whenever he received a new letter from Burney. This correspondence continued until September 2011, during which time Burney wrote 16 letters in response. In those letters, Burney indicated that he was scared for his life and that he wanted help getting out of jail as soon as possible. During this period, the detective learned that other inmates were telling Burney that his "root doctor" was not real. The detective wrote additional letters to reassure Burney, and a female officer from the Upson County Sheriff's Department later posed as "D. Clayton" and visited Burney in the Jones County jail. The State indicated to the trial court that the primary purpose of the letter-writing scheme was to elicit information regarding the other murder for which Burney had been charged. In the pre-trial hearing on Burney's motion to dismiss the indictment relating to Kitchens' death, the State indicated to the trial court that it had no intention of presenting Burney's letters in the guilt/innocence phase of the case regarding Kitchens' murder and indicated that it considered those letters to be inadmissible during that phase of the trial under *Massiah v. United States*, 377 U. S. 201 (84 SCt 1199, 12 LE2d 246) (1964).

found evidence that Burney had intentionally postponed and procrastinated in regard to whether he would obtain counsel to represent him in this case. Specifically, the court noted that Burney knew he could obtain appointed counsel but refused to cooperate in securing representation.[13] The trial court also attributed the delays in the case to the fact that, once Burney did agree to be represented by counsel in December 2011, his counsel was repeatedly unavailable or unprepared for trial. The trial court took particular note of the fact that, on March 20, 2014, the same day Burney moved to dismiss the indictment on speedy trial grounds, Burney's counsel indicated to the trial court that Burney was not ready for trial.[14]

---

[13] The trial court based this finding on evidence that, while being held in the Jones County jail, Burney was advised that he could obtain an application for the appointment of a public defender and that jail personnel would submit the application to the public defender's office. In response, Burney indicated that he planned to retain private counsel. The State introduced evidence that Burney had utilized court-appointed counsel in regard to a prior case involving drug charges.

[14] On March 20, 2014, hearings were held on several motions in the case. The State announced that it was ready for trial, but Burney's attorneys indicated that, due to the need to prepare mitigation evidence for the potential sentencing phase of Burney's then-pending death penalty trial, they did not believe they could be ready or available until sometime in early 2015. That same day, Burney moved to dismiss the indictment on speedy trial grounds.

Further delays in the case resulted after Burney was found to not be competent to stand trial. These findings were not clearly erroneous and support the trial court's determination that the delays in the case were primarily attributable to Burney. See *Williams v. State*, 290 Ga. 24, 26 (2) (717 SE2d 640) (2011) ("[W]hen any portion of a delay in trial is caused by or at the behest of defense counsel, it should not be weighed against the State.").

(c) *Defendant's Assertion of the Right*. Here, the trial court found that Burney did not assert his right to a speedy trial until March 2014, roughly five-and-a-half years after he was arrested. The record supports that finding, and the trial court did not abuse its discretion in weighing this delay heavily against Burney. See *Brannen v. State*, 274 Ga. 454, 456 (553 SE2d 813) (2001) (failure to assert the right to a speedy trial for over four years between arrest and filing of motion to dismiss "is entitled to strong evidentiary weight against the defendant" (citation and punctuation omitted)).

(d) *Prejudice to the Defendant*. Finally, Burney argues that he was prejudiced by the delay in bringing his case to trial. Specifically,

he argues that he suffered from a number of severe mental health issues that were exacerbated by his lengthy confinement, including some time in solitary confinement, and that he suffered from anxiety due to his inability to move his case forward. He also argues that the delay in the case allowed the State to develop the testimony of multiple inmates who had been housed with Burney and that the delay resulted in the GBI's destruction of Kitchens' medical records.

As we have previously discussed,

> [t]he types of prejudice associated with an unreasonable delay before trial include oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence. Of these forms of prejudice, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

(Citation and punctuation omitted.) *Cash*, 307 Ga. at 519 (2) (b) (iv).

Based on testimony from personnel who interacted with Burney while he was in jail, the trial court found that Burney had not been subject to oppressive pre-trial incarceration or substandard conditions; that he had his physical, nutritional, and psychological

demands met while he was incarcerated; and that he had not shown that the anxiety he suffered in jail was greater than that always present to some extent for the incarcerated. Although some evidence suggested that he had begun to suffer from increased anxiety due to his confinement, it was the trial court's duty to resolve conflicts in the evidence, and its findings on this issue are not clearly erroneous. See *Buckner*, 292 Ga. at 391. We therefore do not disturb them on appeal.

The record also authorized the trial court to determine that the claims of prejudice asserted by Burney were meritless. Although the State continued working to gather evidence against Burney while he was incarcerated, those actions occurred during a period of time between October 2008 and September 2011 in which the trial court attributed the delays in the case primarily to Burney's intentional postponement and procrastination in regard to whether he would obtain counsel to represent him in this case and to the actions of Richardson's counsel in seeking multiple continuances in the case. Moreover, as we noted in Division 3, above, it was from a lack of

diligence on Burney's part that he did not obtain Kitchens' medical records from the State after their existence had been disclosed to him, and he has failed to demonstrate how those records would have aided his defense. In its order denying Burney's motion for new trial, the trial court also determined that Burney had not shown the unavailability of any witnesses due to the delay or that the State had engaged in any intentional delay.

In sum, although the delays in this case were presumptively prejudicial, we cannot say that the trial court abused its discretion in applying the *Barker-Doggett* factors to determine that the other factors weighed against a determination that Burney's constitutional right to a speedy trial was violated. Nor was there any clear error in the factual findings supporting those determinations. This enumeration of error therefore fails.

5. Finally, Burney argues that he is entitled to a new trial as a result of juror misconduct. He specifically claims that the trial court erred by not granting him a new trial after it was discovered that one of the jurors accessed an online search engine from her phone

and looked up the terms "malice" and "malice murder" during the jury's deliberations. Because we agree with the trial court that the juror's action was harmless beyond a reasonable doubt, there was no error in denying Burney's motion for new trial.

Two weeks after the conclusion of Burney's trial, the trial court was made aware of potential juror misconduct during deliberations. The State proposed that an independent investigation of the matter be conducted, and without objection from Burney, the Bibb County Sheriff's Department was appointed to conduct the investigation. The trial court prohibited both the State and Burney from conducting other investigations into the issue.

The results of the investigation were presented to the trial court at the hearing on Burney's motion for new trial. The record shows that an investigator interviewed 11 of the 12 jurors (including the juror suspected of misconduct) and made audio recordings of those interviews which were then transcribed.[15] The transcripts

---

[15] The investigator indicated to the trial court that he had attempted to make contact with the twelfth juror but that she had moved and not given any indication as to her whereabouts.

were made part of the record for this case at the hearing on the motion for new trial, and two of the jurors (neither of whom was the juror suspected of misconduct) testified at the hearing.

Based on the investigation and the testimony presented at the hearing, the trial court made the following findings. During jury deliberations, one juror, identified as L. F., was confused about the meaning of the term "malice murder," and the jurors sent a question to the trial court asking that it define that term for them. The trial court declined to answer the jury's question, and it instructed them to continue deliberating. After receiving this response from the trial court, L. F. used her cell phone to look up the definitions of "malice" and "malice murder" through an Internet search engine during a break in the jury's deliberations. After reading the definition online, L.F. was still unclear what those terms meant. L. F. told the investigator that "[t]here were different counts of murder going against [Burney], and I wanted to know the difference between the two." L. F. did not share the results of her searches with the other

jurors.[16]

Later, the jurors sent a second note to the trial court asking, "What does malice mean? What does malice murder mean?" In response, the trial court brought the jurors to the courtroom, re-charged the jurors on the definition of malice murder, and instructed them to continue deliberating. L. F. told the investigator that, after receiving the instruction from the court, she was no longer confused

---

[16] On this point, the evidence was somewhat in conflict. In her statement to the investigator, one of the other jurors, identified as H. H., indicated that she assisted L.F. in looking up the terms on her phone. According to H. H., L. F. then "read the word malice to us." H.H. was one of the two jurors called to testify at the hearing on Burney's motion for new trial. At that hearing, H. H. testified that she observed L. F. "reading out" the definition of "malice murder" on her phone. H. H. did not clarify what she meant by "reading out," but during cross-examination by the State, H. H. testified that L.F. did not show her what she found in her online search and that L. F. was "kind of sitting to the side" during a break in the jury's deliberations when she looked up the terms online. H. H. also testified that she did not believe any of the jurors had relied upon anything found in the online search to reach their verdicts and that it was the trial court's re-instruction of the jury that clarified the definition of "malice murder" for L. F. In its order, the trial court noted "inconsistencies" in the evidence it received on Burney's juror misconduct claim. In reaching its ruling, the trial court appears to have credited the testimony given by H. H. at the hearing on the motion for new trial and disregarded her statement to the investigator to the extent it conflicted with her hearing testimony. Because the trial court was sitting as a trier of fact in determining what transpired during jury deliberations, we defer to its resolution of this and any other conflicts or inconsistencies in the evidence presented. See *Deleon v. State*, 344 Ga. App. 499, 505 (3) (811 SE2d 35) (2018).

as to what "malice" and "malice murder" meant. The jury resumed its deliberations and found Burney guilty on all counts.

In considering Burney's motion for new trial, the trial court determined that, although the act of looking up the terms "malice" and "malice murder" constituted juror misconduct, such conduct was confined to L. F., who did not share the information she learned from the search with any of the other jurors or make any argument in the jury's deliberations based on what she found in her search. The trial court noted that it recharged the jury as to the meaning of "malice murder" after the misconduct occurred and that the jury then rendered its verdicts. The trial court found no evidence that any of the jurors, including L. F., had relied upon anything other than the court's instructions in reaching their verdicts.

> [W]hen irregular juror conduct is shown, there is a presumption of prejudice to the defendant, and the prosecution carries the burden of establishing beyond a reasonable doubt that no harm occurred. . . . [T]he type of irregularity that gives rise to such a presumption of prejudice involves juror misconduct that has the potential to injure a defendant's due process rights, e.g., making an unauthorized visit to the crime scene and then presenting the findings to the jury panel; privately discussing the

defendant's guilt prior to deliberations in violation of the court's instructions; or improperly accessing outside news sources.

(Citations and punctuation omitted.) *Dixon v. State*, 302 Ga. 691, 695 (3) (a) (808 SE2d 696) (2017).

Here, although L. F. clearly engaged in misconduct, the evidence received by the trial court regarding her actions, including her own statements to the investigator, the statements of the other ten jurors who were interviewed, and the testimony presented at the hearing, authorized the trial court to find that L. F. did not share what she learned with other jurors and to determine that her misconduct did not impact any juror's assessment of the charges against Burney, including her own. The cases relied upon by Burney do not require a different result. Compare *Edge v. State*, 345 Ga. App. 794, 796-798 (2) (815 SE2d 146) (2018) (new trial required where multiple jurors obtained and viewed information relevant to a fact in the case), overruled on other grounds by *Flowers v. State*, 307 Ga. 618, 621 (2) n.3 (837 SE2d 824) (2020), and *Chambers v. State*, 321 Ga. App. 512, 515-522 (1) (739 SE2d 513) (2013) (new trial

required where juror "injected into deliberations extra-judicial information" by sharing the results of an online search regarding the definition of the term "defense of habitation in Georgia law" with other jurors (punctuation omitted)), with *Holcomb v. State*, 268 Ga. 100, 103 (2) (485 SE2d 192) (1997) (no new trial required where juror's misconduct did not involve attempt "to persuade another on any issue in the case"). Thus, "no evidence was presented that the juror's conduct contributed to the conviction such that the verdict is inherently lacking in due process." *Hodges v. State*, 302 Ga. 564, 569 (4) (807 SE2d 856) (2017). Because the State carried its burden of establishing beyond a reasonable doubt that the misconduct was harmless, we agree with the trial court that a new trial was not required. This enumeration of error fails.

*Judgment affirmed.  All the Justices concur.*

DECIDED JUNE 29, 2020.
Murder. Jones Superior Court. Before Judge Burleson.
*Brad Gardner, Emily J. Gilbert*, for appellant.
*Stephen A. Bradley, District Attorney, Dawn M. Baskin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.