NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 17, 2024

S23A0905.  RAMIREZ v. THE STATE.

PINSON, Justice.

Appellant Amalia Ramirez was convicted of the malice murder of her elderly mother, Himilce Ramirez, after Himilce was found dead in Ramirez's home in a barren room. Ramirez was Himilce's sole caregiver, and Himilce was found with signs of severe neglect, including sepsis, necrosis, stage-four bedsores, and parts of her body fused together from lack of movement.[1] Ramirez argues on appeal

---

[1] Himilce died on December 6, 2018. On November 19, 2019, a Forsyth County grand jury returned an indictment charging Ramirez with malice murder (Count 1), felony murder predicated on exploitation of an elder person (Count 2), felony murder predicated on neglect of an elder person (Count 3), exploitation of an elder person (Count 4), and neglect of an elder person (Count 5). After a jury trial from June 28, 2021, to July 13, 2021 (which included a recess from July 2, 2021, until July 12, 2021), the jury found Ramirez guilty of all counts. On July 13, 2021, the trial court sentenced Ramirez to life in prison for the malice murder (Count 1) and the remaining counts either merged or were vacated by operation of law. On the same day, Ramirez, through trial counsel, filed a timely motion for new trial, which was later amended by new

that her conviction was not supported by sufficient evidence because there was no evidence of malice. But the evidence, which we recount in detail below, was sufficient to authorize the jury to find that Ramirez acted with malice. So we affirm her conviction.

1. Viewed in the light most favorable to the verdict, the evidence showed that Himilce, who was 83 years old, died of a combination of sepsis, stage-four pressure ulcers (i.e., bedsores) with osteomyelitis (inflammation of the bone), dehydration, and mild bronchopneumonia. Ramirez did not report Himilce's death. Instead, law enforcement arrived at the home where Ramirez and Himilce lived in response to a suicide threat by Ramirez, who reported that she had nothing to live for and had taken pills to kill herself because her mother was dead. After entering the house, the responding patrol officer noticed a foul smell. At the officer's request, Ramirez led him to the room where Himilce's body lay. Paramedics and investigators

---

counsel on June 29, 2022. After a hearing, the trial court denied the motion for new trial, as amended, on March 1, 2023. Ramirez filed a timely notice of appeal on March 6, 2023. Her appeal was docketed to the August 2023 term of this Court and submitted for a decision on the briefs.

arrived soon after and confirmed Himilce's death.

Ramirez said that she had last seen Himilce alive around 9:00 or 10:00 p.m. the night before the officers arrived. Ramirez said that she then woke up around 3:30 a.m., checked on Himilce, and discovered she was dead. At that time, Ramirez washed Himilce's body with soap and water and changed her diaper and T-shirt.

Ramirez told police she had quit her job two years before to care for Himilce full-time. She said she made meals for Himilce and changed her clothes and diaper; she said Himilce would sometimes complain if her diaper had not been changed. Ramirez also said that Himilce was bedridden and sometimes made noises indicating pain, but Ramirez did not know what type of pain Himilce was experiencing, did not think Himilce had any medical diagnoses, and did not take Himilce to the doctor or give her any medication. A neighbor who had lived across the street from Ramirez for between one-and-a-half and two years had never met or seen Himilce.

Overall, Ramirez's home appeared clean and was filled with scented candles. But the room where Himilce's body was found was

dirty, with cat litter on the carpet and cobwebs in the ceiling corners, and it smelled like urine, feces, and body odor. The room had no furniture or décor other than a bare mattress on a box spring, a chair "full of stuff" including an "unidentified mess," and a television. The mattress and box spring were covered in plastic, holes were worn into the plastic, and where the mattress and box spring were exposed, they were stained brown. Himilce was covered with a blanket and dressed in a T-shirt and an unsecured adult diaper.

Detective Lauren Belfani, the lead investigator, described the crime scene as "shocking" and "heartbreaking." When investigators removed the blanket from Himilce's body to photograph her, Detective Belfani immediately observed that Himilce's feet and lower legs looked like "scales" or "leather." Detective Belfani also observed that Himilce's arms appeared to be different sizes and saw sores on Himilce's legs, under her diaper, and on her back. Detective Belfani said that some of the sores on Himilce's back smelled and looked to be black in color. The photos the investigators took of Himilce's body were admitted into evidence and published to the jury.

Both parties presented expert testimony about Himilce's medical condition. Both experts agreed the cause of Himilce's death was a combination of sepsis, bedsores with osteomyelitis, dehydration, and bronchopneumonia. Photos from Himilce's autopsy were admitted into evidence and published to the jury.

The medical examiner explained that sepsis is an infection that starts in one organ and spreads throughout the body via the bloodstream. It is treatable with antibiotics. The medical examiner concluded that Himilce's sepsis likely originated with a urinary tract infection, but the medical examiner could not rule out an association between the sepsis and an infection to the bone from Himilce's stagefour bedsores. The medical examiner explained that symptoms of sepsis typically include fever and sometimes vomiting. The level of infection in Himilce's body was at a "panic level," which would have required immediate attention before she died.

The medical examiner explained that a bedsore is "a lesion on the skin that forms from pressure of the skin onto a surface from not moving very much." Bedsores begin as redness or irritation of the

skin (stage-one); if they progress, the skin begins to break down. If untreated, the skin can break open and the area can become infected, causing more and more layers of skin to break down. Eventually, muscle will break down, too, until the infection reaches the bone underneath the skin. This last stage is classified as stage-four bedsores, which many of Himilce's bedsores were: her bones were visible through lesions at her knees and heel.

The medical examiner described Himilce's skin as "flaky" and "thick" and observed several healing lesions on her lower legs. The medical examiner noted that the skin of Himilce's knees were fused together, and during the autopsy she had to use a scalpel to cut Himilce's legs apart; otherwise, they could not be separated. The medical experts agreed that the fusion was a result of pressure sores, caused by the pressure of Himilce's legs touching each other. The medical examiner explained that the skin of one leg had "healed" to the skin of the other leg, causing them to fuse together. The medical examiner also noted that Himilce's stomach fat, which

would normally shift back-and-forth, was stuck in place. The medical examiner was unable to determine, through her experience or research, exactly how long someone would have to lay in the same position for this to happen. She opined that "perhaps" it could happen in a week but that it also could be consistent with someone lying in the same position for a year. Based on the fusion of the skin at Himilce's knees and the fixed nature of her stomach fat, as well as the difference in size of her legs due to muscle loss in one and fluid retention in the other, the medical examiner concluded that Himilce had been lying on her side with her waist twisted and the right leg on the surface of the bed for an extended period. The medical examiner had never seen someone with their legs and stomach fat fused in place from lack of movement. Likewise, the pathologist Ramirez called to testify also had never seen this degree of fusion and agreed with the medical examiner that the fused tissue at Himilce's stomach and knees indicated she had been in the same position for "a long time."

The medical examiner also observed necrosis (rotting muscle),

pus (indicating infection), stage-four bedsores on Himilce's legs, bedsores on her back, necrosis of the joints, and exposed bone visible through lesions in her skin. The right side of her back had ulcerated lesions and necrosis with black tissue, and her rib bones were visible through her skin. In addition, the medical examiner observed osteomyelitis, an inflammation of the bone, and concluded that the osteomyelitis of Himilce's knees had been present for at least several weeks and that osteomyelitis of her heel and back had been present for at least one-to-two days before her death. There was scar tissue around some of Himilce's bedsores, indicating healing. According to the pathologist who testified for the defense, the fact that Himilce's bedsores were in various stages of healing indicated that they "had been there for a very significant period of time."

In addition to Himilce's fused knees, which would have prevented her from walking, the medical examiner observed that her iliopsoas muscle—the muscle that connects the spine, pelvis, and hips—was necrotic (rotting) and smaller than expected, which indi-

8

cated that the muscle had shrunk from lack of use. The medical examiner noted signs of malnutrition, such as atrophy of the muscles in Himilce's face, which gave her face a "sunken-in look," dehydration, and only bile in her stomach. The medical examiner also concluded that Himilce had pneumonia, kidney stones, necrosis of the bladder, and gallstones.

No evidence was introduced that explained how Himilce became bedridden in the first place. The medical examiner testified that Himilce's heart was relatively healthy for her age, and while she had chronic obstructive pulmonary disease, which makes it difficult to breathe, that would not normally make someone bedridden. The medical examiner testified that all the conditions that contributed to Himilce's death—sepsis, stage-four bedsores, dehydration, and bronchopneumonia—were treatable. Other than allergy medication, Excedrin, and a topical medication, no medications were found in the house. None of Himilce's wounds were bandaged, no ointment appeared on those areas, and they did not appear to have been properly cleaned. The medical examiner testified that, if

Himilce's wounds had been treated, she would expect to see pink skin around the wounds, instead of the black appearance and rotting that was present around many of Himilce's wounds. The medical examiner also explained that, if bedsores are treated at stage one, they can be prevented from progressing to stage four. The pathologist Ramirez called to testify said that treatment of bedsores includes application of a prescription-only topical medication and use of special pillows that help to relieve pressure points. No special pillows or prescriptions for such medications were found in Ramirez's house.

2. Ramirez contends that the evidence was not sufficient to support her conviction for malice murder because there was no evidence of violence toward Himilce, what injuries caused her death, or proof of willfulness. She argues that the evidence that she failed to obtain medical care for Himilce showed only ordinary negligence, not malice.

When reviewing the sufficiency of the evidence, we view the evidence presented in the light most favorable to the verdicts to de-

termine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). In doing so, we do not "weigh the evidence on appeal or resolve conflicts in trial testimony," *Byers v. State*, 311 Ga. 259, 266 (2) (857 SE2d 447) (2021) (citation and punctuation omitted), but instead defer "to the jury's assessment of the weight and credibility of the evidence." *Jones v. State*, 314 Ga. 692, 695 (878 SE2d 502) (2022) (citation and punctuation omitted).

Our murder statute declares that "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). The statute goes on to describe "express" and "implied" malice: "Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof." OCGA § 16-5-1 (b). And "[m]alice shall be implied where no considerable provocation ap-

11

pears and where all the circumstances of the killing show an abandoned and malignant heart." Id.

Because malice is a state of mind, it "frequently must be proven indirectly." *Sanders v. State*, 289 Ga. 656, 658 (1) (715 SE2d 124) (2011), overruled on other grounds by *Pounds v. State*, 309 Ga. 376, 383 (3) (846 SE2d 48) (2020). As we explained in *Sanders*, a decision affirming a malice-murder conviction for causing the death of a baby involving severe neglect, "considerable indirect proof" may be needed to determine whether a victim has been "starved, neglected and abused with malice as to constitute murder, or has merely been harmed as a result of inability, carelessness or accident." Id. at 656-659 (1) (evidence sufficient to support finding of malice where the defendant was responsible for neglect of his baby that included extreme malnourishment or starvation that was not caused by disease or metabolic disorders, where the baby's poor condition would have been apparent for at least a week before his death, and where the baby would have been able to recover from the bronchopneumonia that contributed to his death if he had been treated). That said, it is

for the jury to determine from all the facts and circumstances whether a killing is malicious. See *O'Neal v. State*, 316 Ga. 264, 267 (1) (a) (888 SE2d 42) (2023); *McNabb v. State*, 313 Ga. 701, 709 (1) (b) (872 SE2d 251) (2020); *Benton v. State*, 305 Ga. 242, 244 (1) (a) (824 SE2d 322) (2019). See also *Jackson v. State*, 282 Ga. 668, 671 (653 SE2d 28) (2007) (rejecting defendant's argument on appeal that the evidence showed the killings were, at most, felony murders and not malice murders, because the jury was authorized to conclude from the evidence that he acted with implied malice and fired the shots that killed the victims).

Applying those standards here, the evidence authorized the jury to conclude that Ramirez acted with malice and caused her mother's death. The evidence showed that Ramirez lived with Himilce, was her sole caregiver, and was the only person known to have had contact with her for over a year. And overwhelming evidence showed that Himilce's condition would have been obvious to anyone who saw her: her skin was described as "flaky," "thick," and like "scales" or "leather"; some of the sores had turned black in color

13

and smelled; she also had rotting muscle, exposed bones, and pus from infection. Although neither expert could say how long it would have taken for Himilce's bedsores to get so severe, the evidence supported a conclusion that Ramirez—again, Himilce's only caregiver—knowingly allowed Himilce's obvious medical condition to deteriorate for a prolonged period of time until her death, without ever seeking treatment or other intervention. Both experts agreed that only a "long" period of lying in the same position would have caused the skin at Himilce's knees to fuse together and the fat of her stomach to stick in place. And expert medical testimony made clear that the stage-four bedsores and fused skin would not have happened overnight or suddenly. At the time of her death, Himilce's bedsores had progressed to stage four, meaning her skin and muscle had broken down to expose the bones at her knees and heel. And, before the bedsores progressed to this point, they would have presented first as redness, then as broken skin, before reaching the point at which the muscle broke down to expose the bone beneath—a progression that Ramirez hardly could have missed if she had been changing Himilce

or otherwise providing any kind of "care" for her. As for sepsis, Himilce's infection had reached a "panic level" requiring immediate attention, and the expert testimony indicated Himilce's symptoms would have included fever and possibly vomiting. And the jury could infer from the evidence that Ramirez, who was the sole provider of Himilce's meals, would know how much water she was drinking, so would know whether she could be dehydrated. Based on all the evidence presented, the jury could infer that Himilce's declining health would have been obvious to Ramirez, who said she had quit her job to become Himilce's full-time caregiver and was the only person known to have had contact with Himilce for over a year.[2]

The medical experts also agreed that Himilce's various conditions were preventable or treatable: Her bedsores and the fusion of her legs and stomach fat could have been prevented or at least improved by proper treatment, and her sepsis, dehydration, and bronchopneumonia—together, the causes of her death, according to the

---

[2] We express no opinion as to whether similar evidence of severe neglect would support a conviction for malice murder where the defendant was not the victim's sole, live-in caregiver.

15

medical testimony—were likewise treatable. Yet there was no evidence that these conditions had been treated in any way—there was no evidence of any prescription medication in the home, such as prescription cream used to treat bedsores, the antibiotics used to treat sepsis, or any medication for treating pneumonia, and there were no special pillows that were used to relieve pressure on the body and prevent bedsores for bedbound individuals. The medical experts were unable to identify any underlying disease that Himilce suffered from and would have caused Himilce to become bedridden, and Ramirez, her sole caregiver, allowed Himilce's bedsores to progress to the point where the skin of her knees fused together due to the lack of treatment, which prevented her from moving them.

From all of these circumstances surrounding Himilce's death, including her malnourishment, her other various medical conditions caused by severe neglect, and the "shocking" state she was found in, the jury was authorized to conclude that Ramirez caused her mother's death with malice by allowing Himilce—a woman of ad-

vanced age under Ramirez's exclusive care—to lay immobile and untreated for such a prolonged period until she died. See *Sanders*, 289 Ga. at 656-659 (1). See also *Burney v. State*, 309 Ga. 273, 276-279 (1) (a) (845 SE2d 625) (2020) (concluding that the evidence authorized the jury to conclude that the defendant acted with malice where the defendant held the victim at gun-point, restrained his hands and taped him to a chair, disregarding the victim's repeated outcries that he needed medication, and left the victim bound to his chair, where he was later found dead due to prolonged restraint and complications from lack of medication).

Ramirez points out that no evidence indicated she was ever violent toward Himilce. But evidence of violence is not a necessary component of malice. As in *Sanders*, the evidence of severe and prolonged neglect here authorized the jury to find that the killing was malicious. See OCGA § 16-5-1 (b); *Sanders*, 289 Ga. at 657-659 (1). In sum, under these circumstances, taken together and viewed in the light most favorable to the verdict, the jury was authorized to find Ramirez guilty of malice murder. See OCGA § 16-5-1 (b).

*Judgment affirmed. All the Justices concur.*