**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 15, 2020**

# In the Court of Appeals of Georgia

A20A1312. HUERTA-RAMIREZ v. THE STATE.

BROWN, Judge.

Alejandro Huerta-Ramirez and four others were indicted for crimes arising out of a series of home invasion armed robberies that occurred in Gwinnett County in 2009. Huerta-Ramirez was tried separately in 2015 on the 61-count indictment, and the jury found him guilty of seven counts of armed robbery, eight counts of aggravated assault, sixteen counts of false imprisonment, three counts of burglary, one count of possession of marijuana with the intent to distribute, and three counts of possession of a firearm or knife during the commission of a felony. Huerta-Ramirez appeals his convictions and the denial of his amended motion for new trial, contending that (1) the trial court failed to properly consider the length of the delay between his arrest and his trial as it pertains to his constitutional right to a speedy

trial; (2) the evidence was insufficient to prove six of the aggravated assault convictions; and (3) the trial court should have granted his motion to suppress. He also contends that the trial court improperly admitted a recording of a phone conversation between Huerta-Ramirez and his wife, as well as evidence of a "prior bad act." For the reasons explained below, we affirm.

Viewed in the light most favorable to the jury's verdict, *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), the evidence shows that in November and December 2009, three homes were invaded by gunmen, wearing bulletproof vests and shoulder-mounted radios and carrying what the victims described as an "AK-47 or an R-15" or "AR-15." The robbers held the residents — including several children and a pregnant woman — at gunpoint, stole thousands of dollars in cash, jewelry, cellphones, and other valuable items, and demanded drugs. The robbers threatened to return and kill the residents if they called police, and cut the phone line to at least one of the homes. Two of the victims of the third home invasion testified that the robbers fled in a pick-up truck or "big SUV."

Several months after the home invasions, police were led to Huerta-Ramirez after information obtained from the cellphone towers that serviced the targeted homes identified his cellphone number as having been in the respective area at the time of

2

the robberies. In February 2010, police located Huerta-Ramirez in the parking lot of an apartment complex, at which time he consented to a search of the vehicle he was driving, a green Chevrolet Tahoe. Police recovered from the vehicle $4,200 in cash wrapped in "tin foil" beneath the cup holder, three .223 caliber rounds, and two .22 caliber rounds. Huerta-Ramirez claimed the cash was his, but denied ownership of the remaining items. Huerta-Ramirez also disavowed ownership of the vehicle after initially stating that the vehicle was his.

Police subsequently obtained a wire-intercept order for Huerta-Ramirez's cellphone and also placed a GPS tracking device on the Tahoe while it was in the parking lot of his apartment complex. The GPS device and the intercepted telephone communications led police to observe a drug transaction between Huerta-Ramirez and another man. Armed with this information, police obtained a search warrant for Huerta-Ramirez's home and the Tahoe. During that search, police recovered a "rifle magazine" from the closet in the home, and a 425-gram block of marijuana from the vehicle. Huerta-Ramirez was arrested and gave a custodial statement to police admitting that he was the lookout for the three home invasions. Huerta-Ramirez implicated Enrique Reyes and Jose Garcia, telling police that both men went into the homes with four other men Huerta-Ramirez did not know, and that Garcia "was the

3

one getting people to do [the robberies]"; Garcia "was the boss" and got a bulletproof vest. Reyes gave a statement to police that Huerta-Ramirez discussed with him robbing one of the homes, and that the people who lived in the home were "restaurant people." Reyes told police that Huerta-Ramirez asked him to participate in the armed robbery, drove him by one of the targeted homes, gave him a bulletproof vest and guns, and paid him $2,000.[1]

1. Relying on *West v. State*, 339 Ga. App. 279 (793 SE2d 180) (2016), Huerta-Ramirez contends that the trial court failed to properly analyze his speedy trial claim, and, therefore, remand is required so the trial court can enter proper findings of fact and conclusions of law. We disagree.

The Sixth Amendment to the United States Constitution, as well as the Georgia Constitution, provide criminal defendants with a right to a speedy trial. *Smith v. State*,

---

[1] Both Garcia and Reyes pleaded guilty and testified at trial. Garcia testified that he did not "know anything about the robberies" or "the guy," meaning Huerta-Ramirez; that Huerta-Ramirez had him beaten up in prison; that he was told by members of Huerta-Ramirez's family that "you're going to testify well against Alejandro Huerta-Ramirez . . ."; and that he was testifying because he wanted to help himself and go home. Reyes testified that Huerta-Ramirez never offered him $2,000, and that Huerta-Ramirez drove him by one of the robbery locations and said that they "could . . . commit something," but that Reyes refused because he was working. Reyes denied knowing anything about any of the robberies or making any of the statements to police.

338 Ga. App. 62, 68 (1) (789 SE2d 291) (2016). A constitutional speedy trial claim is evaluated under a two-part framework, as established in *Barker v. Wingo*, 407 U. S. 514 (92 SCt 2182, 33 LE2d 101) (1972), and clarified in *Doggett v. United States*, 505 U. S. 647, 651 (II) (112 SCt 2686, 120 LE2d 520) (1992). See *Redding v. State*, ___ Ga. ___ (2) (844 SE2d 725) (2020); *West*, 339 Ga. App. at 281 (2). "First, the trial court must consider whether the length of time between the defendant's arrest and trial is sufficiently long to be considered 'presumptively prejudicial.' If not, the speedy trial claim fails at the threshold." (Citation and punctuation omitted.) *Redding*, ___ Ga. at ___ (2). A one-year delay is "typically presumed to be prejudicial." (Citation and punctuation omitted.) Id.

> If the presumptive-prejudice threshold is crossed, . . . the trial court proceeds to the second part of the framework, applying a context-focused, four-factor balancing test to determine whether the defendant was denied the right to a speedy trial. These four factors are (1) the length of the delay; (2) the reasons for it; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. This second part of the speedy trial analysis requires courts to engage in a difficult and sensitive balancing process and necessarily compels them to approach speedy trial cases on an ad hoc basis.

(Citation and punctuation omitted.) Id.[2] "When addressing the first factor . . ., the length of delay plays a different role than in the first stage of this analysis and is not given the same degree of weight. Rather, the length of delay is considered in balance with the three other factors." (Citation and punctuation omitted.) *West*, 339 Ga. App. at 282-283 (2) (b) (i). We review the trial court's balancing and weighing of the four *Barker* factors for an abuse of discretion. See id. at 282 (2). And, "[b]ecause the analysis of a speedy trial claim is 'fact intensive,' . . . it is imperative that the trial court enter findings of fact and conclusions of law consistent with *Barker*." *Redding*, ___ Ga. at ___ (2).

In this case, Huerta-Ramirez challenges only the trial court's finding as to the first factor, contending that it erred in failing to accurately determine the specific length of the delay and to weigh the length of that delay. In its order denying Huerta-Ramirez's motion for new trial, wherein the trial court concluded that it properly

___

[2] The four-factor balancing test also has been set out as follows: "(1) whether the delay before trial was uncommonly long, (2) whether the government or the criminal defendant is more to blame for the delay, (3) whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice as the delay's result." (Citation and punctuation omitted.) *Burney v. State*, ___ Ga. ___ (4) (845 SE2d 625) (Case No. S20A0216, decided June 29, 2020).

6

denied his motion for discharge and acquittal, the trial court found as follows with

regard to the first factor:

> A. *Length of the delay*: . . . Here, Defendant was arrested on March 24, 2010, prior to formal charges. Defendant requested numerous continuances. Defendant waited until between December 20, 2013 and January 28, 2014 to file motions to suppress. On April 7, 2014, Defendant requested immediate review from the appellate courts relating to the motion to suppress. On March 23, 2015, the Court of Appeals dismissed the appeal and a remittitur was filed April 8, 2015.[3] Trial began roughly six (6) months later on November 30, 2015.

> The presumptive prejudice arising from delay cannot alone carry a Sixth Amendment claim without regard to the other [*Barker*] criteria. . . . The [c]ourt finds that the length of delay weighs benignly against the State.

In *West*, the trial court made no findings as to the length of the delay or whether

the delay was uncommonly long in relation to the other three *Barker* factors. 339 Ga.

App. at 283 (2) (b) (i). We remanded the case for the trial court to make sufficiently

detailed findings of fact, concluding, *inter alia*, that a trial court "errs when it fails to

accurately determine the specific length of the delay and when it fails to weigh the

---

[3] This Court granted Huerta-Ramirez's interlocutory application, but then dismissed it as improvidently granted.

7

length of the delay in its *Barker-Doggett* analysis." (Citation and punctuation omitted.) Id. at 283 (2) (b) (i), 285 (2) (b) (iv). Although the trial court here did not explicitly state the length of time between arrest and trial, i.e., almost 69 months, the trial court listed the length of delay as a separate factor and specifically noted the arrest date and the date of trial as well as the events that transpired during those dates; found that the length of the delay was presumptively prejudicial; and then expressly found that the delay weighed benignly against the State.

Contrary to Huerta-Ramirez's contention, the trial court did not fail to accurately determine the specific length of the delay or weigh the length of the delay in its *Barker* analysis as in *West*. Because the trial court entered findings of fact and conclusions of law consistent with *Barker*, we affirm its order denying Huerta-Ramirez's amended motion for new trial on this ground. Compare *State v. Porter*, 288 Ga. 524 (705 SE2d 636) (2011) (reversing this Court and remanding case to trial court because it erred in key factual findings and thus could not properly balance the *Barker* factors); *York v. State*, 334 Ga. App. 581, 588 (2) (c) (780 SE2d 352) (2015) (vacating and remanding case where trial court's order failed to make findings of fact regarding whether delay was uncommonly long, which party was more responsible for delay, and what weight it assigned to that factor); *Culbreath v. State*, 328 Ga.

8

App. 153, 161 (4) (b) (761 SE2d 557) (2014) (remand required where trial court made no findings as to the first, second, or third factor, and failed to properly balance the four factors). As Huerta-Ramirez does not challenge the trial court's findings or conclusions as to the other factors, we need not address them.[4] See *State v. Shirley*, 311 Ga. App. 141, 143 (3) (a) (714 SE2d 636) (2011) (this Court need not consider finding as to first factor where State did not challenge it on appeal); *Stewart v. State*, 310 Ga. App. 551, 558 (2) (d) (i) (713 SE2d 708) (2011).

2. Huerta-Ramirez contends that the evidence was insufficient to sustain his convictions for six of the eight counts of aggravated assault because the victims did not testify at trial. We disagree.

"A person may be found guilty of aggravated assault if the State proves (1) an assault and (2) aggravation by use of any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." (Citation and punctuation omitted.) *Myrick v. State*, 325 Ga. App. 607, 608

---

[4] In his brief, Huerta-Ramirez notes in passing that "[f]urthermore, in discussing prejudice to the defense, [the trial court] failed to recognize the presumption of actual prejudice arising from a delay of over five years." But, this allegation of error fails to include either citation to authority or any meaningful legal argument. Accordingly, it is deemed abandoned under Court of Appeals Rule 25 (c) (2). See *Allison v. State*, ___ Ga. App. ___ (3) (846 SE2d 222) (Case No. A20A0552, decided June 29, 2020).

(1) (754 SE2d 395) (2014). See OCGA § 16-5-21 (a) (2). The State may prove an assault by showing that the defendant "[a]ttempts to commit a violent injury to the person of another" or "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a). The six counts challenged by Huerta-Ramirez (Counts 5, 6, 19, 20, 34, and 35) charged him with committing an aggravated assault upon the respective victims "with a firearm, a deadly weapon, by brandishing said firearm in a threatening manner. . . ."

Huerta-Ramirez claims that because the named victims of those six counts either did not testify, or did not state that they were in reasonable apprehension of immediately receiving a violent injury, the evidence was insufficient to prove that he committed aggravated assaults against them. "[T]he failure of a victim of an assault to testify at trial does not necessarily result in the evidence against the defendant being insufficient." *Bostic v. State*, 294 Ga. 845, 847 (1) (757 SE2d 59) (2014). An assault victim's state of mind is a question of fact,

> which may be established by circumstantial evidence. Proof that the victim has been placed in apprehension of immediately receiving a violent injury need not necessarily be solely by reason of the victim's testimony of his mental state but may be inferred from the conduct of the victim. . . .

10

(Citation and punctuation omitted.) Id. at 847-848 (1). See also *Veasey v. State*, 322 Ga. App. 591, 594-595 (1) (c) (745 SE2d 802) (2013) ("presence of a gun would normally place a victim in reasonable apprehension of being injured violently[;] [w]hether the victims have been placed in reasonable apprehension of injury is a question of fact for the jury to determine") (citation and punctuation omitted).

(a) *Counts 5 and 6.* The victims of Count 5 and Count 6 were sisters, ages six and three years old, respectively. At trial, their parents testified that three robbers barged into their home, and that one was brandishing a rifle and the other two had guns as well. The mother testified that one of the men pointed a rifle at the back of her head and made her kneel on the floor, and then grabbed her husband and threw him against the bed in front of the three year old. The same man then pointed his rifle at the mother's nine-year-old daughter. With regard to the six-year-old daughter, the mother testified that after the girl observed a man grabbing things from her room, she came to the room where her mother and sisters were and that they all were sitting on the floor and the man "had [the mother] kneeling there" and that she did not feel like she could leave because a "man with a weapon [was] watching [her]." The nine-year-old daughter, who was fifteen at the time of trial, testified that she woke up to a noise and observed her father get hit in the stomach, her mother crying, and three men with

11

rifles. Although the three- and six-year-old sisters did not testify at trial, testimony that they were forced to kneel with their mother while a man watched over them with a rifle, and that the mother was crying and did not feel like she could leave was sufficient to sustain Huerta-Ramirez's convictions for Counts 5 and 6. See *Petro v. State*, 327 Ga. App. 254, 257-258 (1) (a) (758 SE2d 152) (2014) (testimony by eyewitness that defendant pointed butcher knife at victim, and that victim fled from residence after being threatened with knife and later crouched behind police car "'in fear for his life'" sufficient to sustain conviction for aggravated assault for brandishing a butcher knife even though victim did not testify). See also *Veasey*, 322 Ga. App. at 594-595 (1) (c) (evidence sufficient to sustain convictions for aggravated assault against restaurant owner's wife and three children even though youngest child did not testify).

(b) *Counts 19 and 20.* The victims of Counts 19 and 20 — and the second robbery — lived with Alexandro Rodriguez and three other roommates. Rodriguez testified at trial that six men knocked down his back door and entered the home, brandishing rifles, guns, and knives, threw all six roommates down on the ground, and pointed their guns at all six of the roommates. Rodriguez testified that he did not feel like he could leave because "there were six [robbers], and we couldn't move."

12

The robbers took all of the roommates' cellphones, demanded money, and took "whole wallet[s]." As the State correctly points out, obeying the robbers' commands to stay on the floor and handing over valuables per their demands is sufficient circumstantial evidence that the victims of Counts 19 and 20 were in reasonable apprehension of receiving a violent injury if they did not comply. See *Anderson v. State*, 238 Ga. App. 866, 871-872 (1) (519 SE2d 463) (1999) (testimony of victims that defendant pointed a gun at non-testifying victims and that they complied with defendant's orders sufficient to prove aggravated assault of non-testifying victims).

(c) *Counts 34 and 35*. Counts 34 and 35 concerned two of the victims of the third robbery. The victim of Count 34, who was ten years old at the time of the robbery, testified that she woke to her cousin crying in her bedroom because the robbers had dislocated his shoulder, and that one of the robbers pointed a rifle at her brother's head and "told him to walk towards [her] with his hands up and to just sit with [her] and to turn around." As the man with the rifle stood watch over the victim and her brother, another robber came in the room and asked if the two were cooperating, and the rifle-brandishing robber said "yeah, they're cooperating." Even though the victim testified that the robbers never pointed "the gun at [her]," she testified that they took her jewelry, and that she did not feel like she "could have

13

gotten up and left [because] [t]hey had rifles." During his testimony, the victim's brother confirmed that the robbers pointed a gun at the back of his head, moved him to his sister's bed, forced him to lie down on the bed, and then told him not to move or they would shoot him. As we concluded in Division 2 (b), evidence that the victim complied with the robbers' demands and did not feel like she could leave because they had rifles, is sufficient evidence of reasonable apprehension to sustain Huerta-Ramirez's conviction for Count 34.

The victim of Count 35, Gabier Covarrubias, did not testify, but his sister-in-law testified that after she was thrown to the ground of the bathroom by one of the robbers who threatened to blow off her head if she raised it, she heard the robbers "bringing a cousin and [Gabier] down from upstairs." The sister-in-law's husband testified that he was awakened at 1:30 in the morning to screams of "Police. Police." As he opened his bedroom door, he was hit and knocked down by two men, one carrying a big rifle and the other carrying a revolver. The robbers pointed a rifle at the husband's cheek bone, demanded drugs, and covered the husband's head with a shirt and told him not to move "you son of a bitch." The robbers eventually put the husband, Gabier, and a cousin in the garage, and tied up Gabier and the cousin with a vacuum cord. The victim of Count 34 testified that the two men she observed during

14

the robbery had rifles and that they "brought [her] uncle [Gabier] in and he was just there for a couple of minutes because they took him downstairs." As set out above, "[t]he victim's state of mind may be proved by circumstantial evidence . . . and may be inferred by the victim's conduct." *Anderson*, 238 Ga. App. at 871 (1). Here, evidence that both robbers brandished guns throughout the duration of the home invasion, and that Gabier complied as he was taken downstairs by the robbers and tied up in the garage, is sufficient evidence for the jury to conclude that Gabier had a reasonable apprehension of receiving immediate, violent injury. See id.

*Santiago v. State*, 314 Ga. App. 623 (724 SE2d 793) (2012), upon which Huerta-Ramirez relies, is distinguishable. In that case, we reversed the aggravated assault conviction because the victim did not testify, and the other two testifying victims did not see what the victim did during the robbery:

> They did not testify that [the defendant] pointed or shot the gun at the victim, spoke to the victim, or had any other interaction with the victim. They did not testify that the victim did anything suggesting that he had seen the gun or heard [the defendant]'s threat to shoot somebody, or had any other reaction suggesting that [the defendant] either had attempted to violently injure [the victim] or had placed [the victim] in reasonable apprehension of receiving an immediate violent injury.

15

*Id.* at 624-625 (1). As detailed above, the facts and testimony here are inapposite to those in *Santiago*. Accordingly, there is no merit in Huerta-Ramirez's contention that the evidence was insufficient to sustain his convictions on Counts 5, 6, 19, 20, 34, and 35 of the indictment.

3. Huerta-Ramirez next contends that the trial court erred in denying his motion to suppress evidence obtained through (a) the warrantless placing of the GPS tracking device on the Tahoe, and (b) the warrantless use of cell site location information. He contends that because those searches were unlawful, the fruits of the warrants to search his apartment and vehicle also must be suppressed because both relied upon evidence obtained from the GPS tracker and the cell site location information.

(a) *Cell Site Location Information.* At the outset, we hold that Huerta-Ramirez has waived for appellate review his claim that the cell site location information and subsequent search warrants based on the information gleaned from the "tower dumps" should have been suppressed under the Fourth Amendment. Huerta-Ramirez does not point out in his brief how he preserved any argument related to suppression of the cell site location information, and we have not located anything in the record reflecting that he raised the argument below. In his various motions to suppress, and at the motion to suppress hearing, Huerta-Ramirez moved to suppress the evidence obtained

16

from the search warrants *only* on the ground that the GPS tracking device and wiretaps were unlawful; he did not move to suppress the evidence on the ground that the cell data dump was unlawful. And, in its order denying the motion to suppress, the trial court addressed only the GPS tracking device and the wiretaps. "Because this Court is a court for the correction of errors, we will not consider matters . . . that were not raised and ruled upon in the trial court." (Citation and punctuation omitted.) *In Interest of T. F. N.*, 341 Ga. App. 247, 255 (2) (799 SE2d 591) (2017) (because it was not raised or ruled on below, juvenile waived for appellate review claim that court should have granted his motion for return of cell phones because police's retention of the phones without obtaining a new search warrant constituted an illegal seizure under the Fourth Amendment). See also *Bryant v. State*, 288 Ga. 876, 894 (13) (b) (708 SE2d 362) (2011) (failure to raise argument in motion to suppress waives the argument on appeal); *Massey v. State*, 350 Ga. App. 427, 430 (2) (a) (827 SE2d 921) (2019); *Locher v. State*, 293 Ga. App. 67, 68-69 (1) (666 SE2d 468) (2008) ("[i]n challenging a trial court's denial of a motion to suppress, a defendant may not argue on appeal grounds that he did not argue (and obtain a ruling on) below"). As Huerta-Ramirez did not raise this argument below, he has waived it here.

(b) *GPS Tracking Device.* With regard to Huerta-Ramirez's claim related to the GPS tracking device, we are guided by the following standard:

> In a hearing on a motion to suppress, the trial court sits as the trier of fact and its findings are analogous to a jury verdict. Accordingly, we defer to the trial court's credibility determinations and will not disturb its factual findings in the absence of clear error. And when reviewing the grant or denial of a motion to suppress, an appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment. Additionally, as a general rule, an appellate court must limit its consideration of the disputed facts to those expressly found by the trial court. An appellate court may, however, consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape. Finally, although we defer to the trial court's fact-finding, we owe no deference to the trial court's legal conclusions. Instead, we independently apply the law to the facts as found by the trial court.

(Citations and punctuation omitted.) *Mullins v. State*, 355 Ga. App. 452, 452-453 (844 SE2d 519) (Case No. A20A0365, decided June 10, 2020). Moreover, "we may consider all relevant and admissible evidence of record introduced at the motion hearing or during trial." *Walker v. State*, 314 Ga. App. 67 (1) (722 SE2d 887) (2012).

18

So viewed, the record reflects that a Gwinnett County detective approached Huerta-Ramirez in the parking lot of an apartment complex on February 26, 2010, while he was standing with two other men next to the Tahoe. Huerta-Ramirez told the detective that he owned the Tahoe, and consented to a search of the vehicle. When the detective discovered three .223 rifle rounds and two .22 caliber rounds in the vehicle, Huerta-Ramirez disavowed ownership of the vehicle. The detective also found $4,200 in cash, and zip ties. Huerta-Ramirez told the detective the money was his, but that "he didn't know anything about the zip ties because it wasn't his vehicle." During the suppression hearing, the State introduced into evidence a document from the Georgia Registration and Title Information System, reflecting that the Tahoe was purchased on July 20, 2009, and registered in the name of "Benita Hernandez-Morales."

Huerta-Ramirez testified at the suppression hearing that he had owned the Tahoe for more than a year before his arrest and purchased it for $15,000, and that he drove the vehicle exclusively unless his sister loaned him a car to drive whenever his wife drove the Tahoe. He explained that he purchased the Tahoe from a dealership in Jonesboro, and that his wife put it in her name. When asked if he owned the Tahoe on March 3, 2010, Huerta-Ramirez said, "No. In other words, it was my car, but it

wasn't in my name." He explained that the vehicle was in his mother-in-law's name "[b]ecause the insurance had gotten too expensive in [his] wife's name so [they] decided to transfer it to [his] mother-in-law's name." His mother-in-law did not use the vehicle, and their understanding was that "[t]he car was [his]. She was just going to put the insurance in her name." Huerta-Ramirez explained that when he was approached by the detective on February 26, 2010, he denied ownership of the Tahoe because "if [he] had said yes, [the detective] would have checked the tag on the car and seen that it wasn't registered to me and so I couldn't say — I don't want to say that the car was mine because it wasn't registered to me." He further testified that he told the detective that a friend had left the "bullets" in the vehicle and that he had no idea where the zip ties came from. Huerta-Ramirez confirmed that the vehicle was his and that he had no idea "how things that are in [his] car got there."

Several days after the detective's encounter with Huerta-Ramirez in the parking lot of his apartment, police placed a GPS tracker on the Tahoe without a warrant. The Tahoe was parked at the apartment complex at the time the GPS tracker was installed.

In denying Huerta-Ramirez's motion to suppress evidence obtained through the warrantless placement of the GPS tracker on the Tahoe, the trial court ruled "that given [Huerta-Ramirez]'s affirmative denial of ownership interest in the Tahoe

20

vehicle, any expectation of privacy he may have had is not one that society is prepared to recognize as reasonable." Huerta-Ramirez contends that the trial court's conclusion was erroneous because as the driver of the Tahoe, he had a legally recognized privacy interest in the vehicle. We find no merit in this contention.

In *United States v. Jones*, 565 U. S. 400 (132 SCt 945, 181 LE2d 911) (2012), the Supreme Court of the United States held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" under the Fourth Amendment. (Footnote omitted.) Id. at 404 (II) (A). The Court's conclusion was based upon a "common-law trespassory test," and not upon "the reasonable-expectation-of-privacy" test enunciated in *Katz v. United States*, 389 U. S. 347, 351 (88 SCt 507, 19 LE2d 576) (1967). See *Jones*, 565 U. S. at 409 (II) (A). Indeed,

> the [United States] Supreme Court clarified that the *Katz* reasonable-expectation-of-privacy test had been added to, not substituted for, the common-law trespassory test. Therefore, when one contends that he was aggrieved by an unreasonable search and seeks to suppress evidence obtained as a result of the search, he must show, among other things, that an agent of the government either trespassed upon his property, . . . or invaded some other place or thing in which he has a reasonable expectation of privacy.

21

(Citations and punctuation omitted; emphasis omitted.) *Green v. State*, 331 Ga. App. 801, 804-805 (1) (771 SE2d 518) (2015). See also *Brown v. State*, 295 Ga. 695, 698 (2) (763 SE2d 710) (2014) ("[t]he burden is on the defendant to show that he has standing to contest the alleged violation, i.e., that he has a legitimate expectation of privacy . . .") (citation and punctuation omitted). Moreover, "[i]t is well established that the Fourth Amendment right against unreasonable search and seizure is a personal right and may not be asserted vicariously." (Citation and punctuation omitted.) *State v. Walker*, 350 Ga. App. 168, 177 (2) (b) (828 SE2d 402) (2019). Thus, "[w]hen a defendant disavows ownership of or other legitimate possessory interest in the item searched, he has no legitimate expectation of privacy in that item, and thus a search violates no right." (Citation and punctuation omitted.) *Nation v. State*, 252 Ga. App. 620, 623 (2) (556 SE2d 196) (2001). In this case, the trial court was authorized to reject Huerta-Ramirez's testimony at the suppression hearing that he owned the vehicle and only registered it in his mother-in-law's name for insurance purposes. In this regard, we note that Huerta-Ramirez's testimony that he denied ownership of the Tahoe because the detective would have checked the tag and discovered that the vehicle was not registered to him fails to account for the fact that Huerta-Ramirez initially told the officer that he owned the vehicle. As "[c]redibility

22

and weight are matters for the factfinder," *Merriman v. State*, 201 Ga. App. 817, 819 (1) (412 SE2d 598) (1991) (physical precedent only), the evidence authorized the trial court's conclusion that Huerta-Ramirez disavowed ownership of the Tahoe. Accordingly, he had no expectation of privacy in the Tahoe, and the trial court did not err in denying his motion to suppress evidence obtained from the GPS tracker. See *Nation*, 252 Ga. App. at 623 (2). See also *Ragin v. State*, 192 Ga. App. 686, 687-688 (2) (385 SE2d 770) (1989). It follows that placement of the GPS tracking device did not "taint" the subsequent search warrants for the Tahoe or apartment.

4. Huerta-Ramirez contends that the trial court erred in admitting a phone conversation he had with his wife because it was a confidential communication protected by OCGA § 24-5-501 (a) (1). We disagree.

After his arrest, Huerta-Ramirez was read his *Miranda* rights and interviewed by detectives for almost two hours. During the interview, Huerta-Ramirez acknowledged that the conversation in the room was being recorded, though he misidentified the recording device, believing he was being recorded on a device held by a detective, and one of the detectives advised Huerta-Ramirez that he was being recorded. Toward the end of the interview, Huerta-Ramirez borrowed a detective's cellphone to call his wife, and had a thirty-minute phone conversation with her; only

23

Huerta-Ramirez's side of the conversation can be heard on the recording.[5] The interview was played for the jury, but because the cellphone conversation was entirely in Spanish, the State provided a written transcript, which included a Spanish-to-English translation. The trial court told the jurors that they would be given copies of the transcript, but instructed them that the taped cellphone conversation itself was the evidence, not the transcript, which was just there to assist them. During the cellphone conversation, Huerta-Ramirez told his wife three times that he was "fucked!" He also cursed Jose (Garcia), who implicated him.

In Georgia, confidential communications between a husband and wife are privileged. OCGA § 24-5-501 (a) (1) (formerly OCGA §§ 24-9-21 (1), 24-9-23). See *Wilcox v. State*, 250 Ga. 745, 754-755 (3) (301 SE2d 251) (1983); *Brown v. State*, 199 Ga. App. 188, 189 (1) (404 SE2d 469) (1991). Also included as confidential communications under OCGA § 24-5-501 are communications between attorney and

---

[5] Although Huerta-Ramirez states in his brief that the detective left the interview room, stating "'I'll give you your privacy,'" our review of the video reflects that the detective made no such statement, instead stating, "I'll close the door [and] I'll be back in five, ten minutes." In any event, even if the detective made such a statement, Huerta-Ramirez does not point out where in the lengthy videotape of his custodial interview such statement is made, and it is not our duty to cull the record on his behalf. See *Aceves v. State*, 296 Ga. App. 596, 597 (675 SE2d 516) (2009). Moreover, it is not enough to cite counsel's statement during his motion in limine that the detective made such a statement.

client, accountant and client, and psychiatrist and patient. See OCGA § 24-5-501 (a) (2), (a) (5), and (a) (9) (formerly OCGA § 24-9-24). In *Cocroft v. Cocroft*, 158 Ga. 714, 719 (3) (124 SE 346) (1924), our Supreme Court discussed admissions and communications excluded from public policy, including communications between husband and wife, and communications between attorney and client, and noted that "[i]t will be perceived that the same rule that applies to communications between husband and wife also applies to communications between attorney and client." Id. In that case, the Supreme Court reiterated that a statement made by a client to his attorney in the presence of a third party is not confidential or privileged. Id. See also *Chancey v. State*, 256 Ga. 415, 436-437 (12) (349 SE2d 717) (1986) (where one spouse testifies to what was said by the other spouse in the presence of a third person, the communication is not privileged).

Citing to *Cocroft*, the Supreme Court in *Rogers v. State*, 290 Ga. 18 (717 SE2d 629) (2011), rejected the appellant's argument that the trial court erred in admitting a recording capturing a three-way telephone conversation the appellant placed from jail while awaiting trial between himself, his girlfriend, and his attorney because the recording violated his attorney-client privilege. Id. at 20 (2). Noting that the privilege does not extend to situations in which third parties are present for attorney-client

25

discussions, the Court found no evidence that the appellant's conversation with his attorney could be considered confidential because it was initiated as a three-way call, and the evidence showed that the appellant's girlfriend heard the conversation. Id. The Court affirmed the trial court's admission of the recording, recognizing the "rule that communications between an attorney and client in the presence of third persons or of the adverse party are not within the prohibition against testimony regarding the communication." (Citation and punctuation omitted.) Id. We glean from these cases that the rule applicable to attorney-client communications applies equally to the marital/spousal privilege. Accordingly, similar to *Rogers*, in this case, Huerta-Ramirez's cellphone call to his wife while in the custodial interview room was not a confidential communication protected by OCGA § 24-5-501 (a) (1) because it was made after Huerta-Ramirez specifically acknowledged to detectives during the interview that he was being recorded, was also told that the interview was being recorded, and was using the detective's cellphone; it is of no consequence that the detective closed the door to the interview room, leaving Huerta-Ramirez alone. In any event, even if the trial court erred in admitting the recording, the error was harmless given that Huerta-Ramirez admitted during the interview with detectives to his participation in the robberies, confirming the detectives' statements that Huerta-

Ramirez stayed in the vehicle and acted as the lookout and took a "smaller cut" of the stolen goods, while "Jose and Enrique" went inside the homes.

5. As set out in footnote 1, supra, co-defendant Garcia testified at trial that Huerta-Ramirez had him "beat up" in prison. The trial court rejected Huerta-Ramirez's objections to the testimony on grounds of lack of foundation, relevancy, and improper character evidence, finding that "all of [Garcia's] testimony goes to his credibility." On appeal, Huerta-Ramirez contends that the trial court erred in admitting this testimony as improper character evidence (a prior bad act) under OCGA § 24-4-404 (b), without notice and a hearing.[6] Once again, we disagree.

At trial, Garcia testified that he pleaded guilty to over 40 charges related to the armed robberies and was serving a 40-year sentence. After Garcia testified that he

---

[6] In his brief, Huerta-Ramirez argues as follows:

Garcia made a deal to testify for the [S]tate and then took the stand and recanted. He failed to implicate [Huerta-Ramirez] in any of the home invasions. The State, faced with a now antagonistic witness, wanted to show the jury that Garcia was withholding testimony against [Huerta-Ramirez] because [Huerta-Ramirez] had intimidated him by arranging a prison beating.While this may be a legitimate use of evidence, the State still has to go through the Rule 404 (b) procedures and the [trial] court still has to make the required determinations.

27

knew Huerta-Ramirez and that Huerta-Ramirez called him on the phone to get work, the State asked Garcia if he had been "beat up" in prison. Garcia responded, "Yes . . . two, three months ago . . . [b]ecause of [Huerta-Ramirez]." At that point, defense counsel objected on the ground of lack of foundation, and the trial court took up the matter outside the presence of the jury. Defense counsel then moved for a mistrial, arguing that the statement was prejudicial and not probative, and that he had been blind-sided by the testimony. The State argued that the testimony "goes to [Garcia's] state of mind of getting beat up and whether or not he's going to be forthcoming about testifying and why he thinks that he was beat up, which goes directly to this case about what he's going to say or not say from the stand." The trial court determined that part of Garcia's sentence was to testify truthfully, and then allowed the State to voir dire Garcia outside the presence of the jury. Garcia explained that he was beat up in prison "[b]ecause where I am in prison he has family. And they told me that it was because of him. And that if I came to court, to please testify well. And he represents a gang. And he's Pachuco and there's a lot of Pachucos over there. He knows very well." Garcia then stated that he knew nothing about the robberies for which Huerta-Ramirez was on trial. The trial court denied the motion for mistrial on the ground of lack of foundation, and then the State explained that the information

was relevant to show the witness' bias and prejudice. Defense counsel renewed his motion for a mistrial, arguing that the evidence was irrelevant and improper character evidence, elicited only to prejudice his client. The trial court denied the motion for mistrial on the ground of relevance/prejudice and instructed the State not to illicit any additional testimony on the issue from Garcia, but advised defense counsel that he could cross-examine Garcia about his belief as to why he was beaten up. On cross-examination, Garcia stated that if he did not testify during the trial of Huerta-Ramirez, his sentence would be revoked. Garcia went on to testify that he knew nothing about any of the robberies or anybody's involvement, and that his testimony had never changed over the years. Defense counsel then asked, "And you've told this jury that you think you were beat up because of Mr. Huerta?" Garcia responded, "Yes, because they cleared it, very clearly, that him." After establishing that Garcia was in Coffee County Prison, defense counsel asked, "Is it correct to say that Mr. Huerta has never visited you at Coffee County Prison?" Garcia responded, "No, but he belongs to a gang and he knows who is there with me." Defense counsel objected to Garcia's reference to a gang, and moved for a mistrial. The trial court denied the motion, ruling that defense counsel had opened the door. Defense counsel continued to question Garcia about the threat, and Garcia testified that he was told to testify "well against

29

Alejandro Huerta-Ramirez." Garcia further explained that he simply wanted to serve his time, and did not "want to be involved with any of this. And if I'm involved in this [it's] thanks to other people. Today I'm being accused and my life is in jeopardy in prison. And why? Because of the same person that accused me with the law. And now he's playing another game with my life in prison." The trial court ultimately denied defense counsel's motion for a mistrial, ruling that all of Garcia's "testimony goes to his credibility."

Under Georgia law, "[t]hreat evidence is admissible to explain a witness'[ ] conduct on the stand" regardless of whether or not the threat is tied to the defendant. *Williams v. State*, 335 Ga. App. 841, 844 (2) (783 SE2d 362) (2016). See also *Bryant v. State*, 296 Ga. 456, 459 (2) (a) (769 SE2d 57) (2015); *Foster v. State*, 294 Ga. 383, 386 (6) (754 SE2d 33) (2014); *Coleman v. State*, 278 Ga. 486, 488 (3) (604 SE2d 151) (2004). Given that Garcia pleaded guilty to his involvement in the robberies, but continued to declare that he knew nothing about the crimes or the individuals involved, evidence that Huerta-Ramirez orchestrated a threat against Garcia was admissible to explain why Garcia continued to disavow any knowledge of the events. The evidence was admissible as "threat evidence," and Huerta-Ramirez does not

30

direct us to authority requiring notice or a hearing before such evidence may be admitted.

Finally, we find meritless Huerta-Ramirez's claim that the evidence was hearsay, "because Garcia must have heard about the . . . [threat] scheme second hand." As our Supreme Court pointed out in *Coleman*, threat evidence such as this is not offered to prove the truth of the matter asserted; rather, it is admitted to explain the witness' conduct on the witness stand. 278 Ga. at 487 (3). See OCGA § 24-8-801 (c) ("'[h]earsay' means a statement, other than one made by the declarant while testifying at the trial of hearing, offered in evidence to prove the truth of the matter asserted"). Accordingly, the trial court did not abuse its discretion in admitting the evidence.

*Judgment affirmed. Dillard, P. J., and Rickman, J., concur*.